IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
CIVIL ACTION NO: 1:16-cv-1174

| | |
|---|---|
| NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY, a North Carolina Corporation, | |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMIARY INJUNCTION** |
| STAMFORD BROOK CAPITAL, LLC, a Delaware limited liability company, *et al.* | |
| Defendants. | |

Plaintiff, North Carolina Mutual Life Insurance Company ("North Carolina Mutual"), files this Memorandum of Law in Support of its Motion for a Preliminary Injunction against Defendants Stamford Brook Capital, LLC ("Stamford Brook"), Forefront Capital Holdings, LLC ("Forefront Capital Holdings"), Forefront Capital, LLC ("Forefront Capital," together with Stamford Brook and Forefront Capital Holdings, the "Forefront Entities"), Port Royal Reassurance Company SPC, Ltd. ("Port Royal"), Summit Trust Company ("Summit"), Bradley Reifler ("Reifler"), and Michael Flatley ("Flatley").

## STATEMENT OF THE CASE

North Carolina Mutual entrusted Defendants with the investment and safekeeping of a significant amount of its assets. Despite advising North Carolina Mutual that they understood and intended to comply with the express language of the contracts and North Carolina law, Defendants failed to do so, by investing the assets in certain investments that clearly do not comply.

Once North Carolina Mutual became aware of Defendants' actions, Defendants have provided North Carolina Mutual with conflicting information and documents regarding North Carolina Mutual's investments. Notwithstanding the conflicting information that it has received, one thing has become clear—in addition to the clear breaches of the Trust Agreement and the Investment Advisory Agreement by Summit, Port Royal, and Stamford Brook, the Forefront Entities and their principals, Bradley Reifler ("Reifler") and Michael Flatley ("Flatley"), have conspired in a fraudulent scheme to invest North Carolina Mutual's assets into investments designed to benefit the Forefront Entities and themselves, individually.

Based on the conflicting information received from Defendants, North Carolina Mutual has been unable to determine the specific investments that make up the Trust Assets. Nevertheless, the conflicting information provided suggests that the Trust Assets are currently invested contrary to the terms of the operational agreements and to the limited class of investments permitted for life insurance companies by N.C. Gen. Stat. § 58-7-173.

Should the North Carolina Commissioner of Insurance determine that the Trust Assets are in violation of N.C. Gen. Stat. § 58-7-173, North Carolina Mutual must address the issue within 90 days. Otherwise, the Commissioner of Insurance may refuse to include the value of such investments in assessing North Carolina Mutual's financial position. Such a course of events would constitute a direct threat to North Carolina Mutual, and is the textbook definition of irreparable harm.

Accordingly, North Carolina Mutual is requesting a mandatory, preliminary injunction pursuant to Counts I (accounting under N.C. Gen. Stat. §§ 36C-8-813 and 36C-2-201 against Port Royal and Summit), Count II (breach of the Trust Agreement against Port Royal and Summit), Count III (breach of the Investment Advisory Agreement against Stamford Brook), and Count IV (breach of fiduciary duty against the Forefront Entities, Reifler, and Flatley). North Carolina Mutual requests entry of an order requiring Defendants to provide a full accounting of all Trust Assets, including sufficient documents and information to determine whether the assets are Eligible Assets and/or fully negotiable. To the extent the Trust Assets are determined not to be Eligible Assets, North Carolina Mutual further requests an order that Defendants liquidate, redeem, or otherwise exchange the assets into cash (or some other Eligible Asset) within 90 days; and that all accounts containing Trust Assets be frozen to preclude Defendants from transferring or otherwise encumbering the Trust Assets.

3

## STATEMENT OF FACTS

North Carolina Mutual is an insurance company that was founded in 1898 and serves the insurance needs of both individuals and groups. (Declaration of Michael Lawrence ¶ 2, attached hereto as **Exhibit A** (hereinafter, "Lawrence Declaration".) In or around December 2003, North Carolina Mutual and the predecessor-in-interest to Markel Bermuda, Limited ("Markel") entered into a Co-Insurance Agreement wherein North Carolina Mutual agreed to cede to Markel liabilities and obligations with respect to certain of North Carolina Mutual's insurance policies. (Lawrence Declaration ¶ 3.) Port Royal and North Carolina Mutual subsequently entered into an indemnity reinsurance agreement, through a Novation Agreement, effective April 24, 2015 (the "Novation Agreement"), pursuant to which Port Royal assumed the place of Markel, by accepting and reinsuring on a one-hundred percent (100%) coinsurance basis certain risks, liabilities, and obligations of North Carolina Mutual under certain of its life insurance policies and annuity contracts. (Novation Agreement, attached as **Exhibit B**.)

Pursuant to, and as required by the Novation Agreement, on April 23, 2015, North Carolina Mutual, Port Royal, and Summit executed a Reinsurance Trust Agreement (the "Trust Agreement"). (Trust Agreement, attached as **Exhibit C**.)

Pursuant to the Trust Agreement and the Novation Agreement, Markel—on behalf of Port Royal as the Grantor under the Trust Agreement—deposited substantial assets in cash (the "Trust Assets") into a trust account (the "Trust Account"). (Novation Agreement, Article 3; Lawrence Declaration ¶ 6.) Pursuant to the Novation Agreement,

4

Port Royal was required to make up the shortfall between the Novation Premium and the required reserves—which was equal to the $5,000,000 Novation Commission kept by Markel. (Novation Agreement, Article 3.) Forefront Capital Holdings was to fund the $5,000,000 shortfall on behalf of Port Royal into the Trust Assets. (Declaration of Steven Fickes ¶ 2, attached hereto as **Exhibit D** (hereinafter, "Fickes Declaration").) Summit serves as the Trust Account's trustee, and North Carolina Mutual is the Trust Account's beneficiary. (Trust Agreement at 1.)

The Trust Agreement permits Port Royal to appoint an "Investment Manager" to manage the investment of the Trust Assets. (Trust Agreement § 4(d).) It requires, however, that the Investment Manager invest the Trust Assets "subject to the terms and conditions of" the Trust Agreement. (*Id.*) Section 4(b) of the Trust Agreement requires that the Trustee (Summit) invest the Trust Assets only in Eligible Assets, which are expressly defined in Section 11 of the Trust Agreement as "cash (United States legal tender) and those securities specified in the investment guidelines attached to the [Trust Agreement] as Exhibit C." (Trust Agreement § 4(b).)

Port Royal appointed Stamford Brook as Investment Manager of the Trust Assets. (Trust Agreement § 4(d).) Pursuant to Section 4(d) of the Trust Agreement, Port Royal and Stamford Brook entered into an Investment Advisory Agreement, attached as **Exhibit E**. (Trust Agreement § 4(d).) Port Royal and Stamford Brook entered into the Investment Advisory Agreement for the direct benefit of North Carolina Mutual, as evidenced by, *inter alia*, the fact that North Carolina Mutual was the sole beneficiary of

the assets to be managed by Stamford Brook, of which both Port Royal and Stamford Brook were aware. (Fickes Declaration ¶ 3.) Stamford Brook is an affiliate and/or subsidiary of Forefront Capital Holdings. (Lawrence Declaration ¶ 8.)

The Investment Advisory Agreement was signed by David Wasitowski ("Wasitowski"), as Forefront Capital Holdings' CFO on behalf of Stamford Brook, and Steven W. Fickes ("Fickes") as President of Port Royal. (*See* Investment Advisory Agreement; Fickes Declaration ¶ 4.) North Carolina Mutual subsequently determined that sometime after April 24, 2015, and unbeknownst to North Carolina Mutual, representatives of Forefront Capital Holdings provided an altered and/or forged copy of the same Investment Advisory Agreement to Summit (the "Fraudulent Investment Advisory Agreement," attached as **Exhibit F**). (Fickes Declaration ¶ 5; Lawrence Declaration ¶ 9.)

The alterations made to the Fraudulent Investment Advisory Agreement were that Bradley Reifler ("Reifler") signed the agreement for Stamford Brook; and Michael Flatley ("Flatley"), an employee of Forefront Capital Holdings, signed for Port Royal. (*See* Fraudulent Investment Advisory Agreement.) Flatley, however, has never held any position with Port Royal, in any capacity. (Fickes Declaration ¶ 7.) In addition, Forefront Capital Holdings submitted to Summit and/or the Trust Account's administrator at the time, Gemini Fund Services, LLC, a "List of Authorized Signers" (attached as **Exhibit G**) for the Port Royal North Carolina Mutual Reassurance Trust Custodial Accounts, which included Reifler and Flatley as authorized signers. (Fickes

Declaration ¶ 8.) Reifler and Flatley were never authorized as signatories of the Trust Account. (Fickes Declaration ¶ 10.)

Sometime after April 24, 2015, and unbeknownst to North Carolina Mutual, representatives of the Forefront Entities, presumably relying on the Fraudulent Investment Advisory Agreement, invested virtually all of North Carolina Mutual's cash into investments that were either directly or indirectly linked to the Forefront Entities. (Lawrence Declaration ¶ 10.) More specifically, and without North Carolina Mutual's or Port Royal's consent, the Forefront Entities invested North Carolina Mutual's assets in investments that do not comply with the requirements of North Carolina General Statute § 58-7-173, for example:

a. A portion of the assets as "seed funding" for the Forefront Income Trust, a "closed end investment company," which the Forefront Entities describe as "a speculative" and "illiquid" investment that "invest[s] substantially all of its assets in a portfolio of unrated or below-investment-grade-rated (commonly referred to as "junk" or high yield/high risk) loans and debt instruments;"

b. A portion of the assets in the form of a promissory note made by Forefront Partners, LLC, as borrower, which Reifler executed on behalf of Forefront Partners, LLC. Thus, North Carolina Mutual's investment advisor made the decision to loan itself a substantial amount of assets. The promissory note was due and payable in full on January 25, 2016; however, it appears that Reifler attempted to unilaterally extended the maturity date of the note to January 25, 2017 in the agreement attached hereto as **Exhibit H**.

c. A portion of the assets in the form of a promissory note made by Forefront Talking Capital Investment, LLC. Reifler executed the promissory note on behalf of the Forefront entity. Thus, it appears that North Carolina Mutual's investment advisor once again chose to loan itself North Carolina Mutual's assets;

d. A portion of the assets in the form of yet another promissory note made by Forefront Partners, LLC. Reifler again executed the note on Forefront

7

Partners' behalf and the Forefront Entities appear to have once again made the decision to loan themselves money.

(*See* email from Gary M. Fellner to Turner A. Broughton dated September 12, 2016, and related attachment, attached as **Exhibit I**.) Summit permitted the substitution of the cash in the Trust Account into these assets without prior written consent from North Carolina Mutual, as required under Sections 2(d) and 4(c) of the Trust Agreement. (Trust Agreement §§ 2(d), 4(c); Lawrence Declaration ¶ 13.)

In or about August 2016, North Carolina Mutual received certain information and documents from Summit regarding the Trust Assets, including the Fraudulent Investment Advisory Agreement. (Lawrence Declaration ¶ 14.) During that same time period, North Carolina Mutual also requested from and received documents from Port Royal regarding the Trust Assets. (Lawrence Declaration ¶ 15.)

On or about September 9, 2016, Summit sent a letter to the North Carolina Department of Insurance, attached hereto as **Exhibit J**. The September 9, 2016 letter included, *inter alia*, a purported statement of the Trust Assets from August 16, 2016 to September 8, 2016. (*Id*.)

On or about September 12, 2016, North Carolina Mutual received from counsel for Forefront Capital Holdings, information regarding the Trust Assets as of June 28, 2016. (*See* email from Gary M. Fellner to Turner A. Broughton dated September 12, 2016, and related attachment, attached hereto as **Exhibit I**.)

The information and documents regarding the Trust Assets that were received from Summit, Port Royal and the Forefront Entities are not the same, as evidenced by

8

two different versions of the Investment Advisory Agreement. (*Compare* **Ex. E** *with* **Ex. F**.) Moreover, the Trust Assets that Summit identified on September 9, 2016 through the purported Trust Account statements are not consistent with, and show different assets than, those assets identified as Trust Assets by Forefront Capital Holdings on September 12, 2016. (*Compare* **Ex. I** *with* **Ex. J**.)

## ARGUMENT

The purpose of a preliminary injunction is to preserve the status quo, prevent irreparable harm during the pendency of a lawsuit, and, ultimately, "to preserve the court's ability to render a meaningful judgment on the merits." *Wheelihan v. Bingham*, 345 F. Supp. 2d 550, 553 (M.D.N.C. 2004) (citation and quotation marks omitted). To obtain preliminary injunctive relief, the plaintiff must establish: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Resources Defense Council, Inc.*, 129 S. Ct. 365, 375–76 (2008); *Pashby v. Delia*, 709 F. 3d 307, 320-21 (4th Cir. 2013).

A mandatory preliminary injunction may be issued when "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter relief on the merits of the same kind." *In re Microsoft Corp. Antitrust Litig.*, 333 F. 3d 517, 526 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L.Ed. 2d 41 (2006).

I.      **North Carolina Mutual is Likely to Succeed on the Merits of the Claims for Which it Seeks a Preliminary Injunction.**

North Carolina Mutual has asserted claims for, *inter alia*, an accounting of the Trust Assets under N.C. Gen. Stat. §§ 36C-8-813 and 36C-2-201 against Port Royal and Summit (Count I); breach of the Trust Agreement against Port Royal and Summit (Count II), and the Investment Advisory Agreement against Stamford Brook (Count III); and for breach of fiduciary duty (Count IV) against the Forefront Entities, Reifler, and Flatley. North Carolina Mutual is likely to succeed on the merits of all of these claims.

A.      **North Carolina Mutual is entitled to an accounting of its trust assets and, therefore, is likely to succeed on the merits of Count I.**

N.C. Gen. Stat. § 36C-2-201 provides that "[t]he court may intervene in the administration of a trust to the extent its jurisdiction is invoked by a party or as provided by law." N.C. Gen. Stat. § 36C-2-201(a). It further states that "[a] judicial proceeding involving a trust may relate to any matter involving the trust's administration, including a request for instructions and an action to declare rights." N.C. Gen. Stat. § 36C-2-201(c). Furthermore, N.C. Gen. Stat. § 36C-8-813 states that the trustee of a trust is "under a duty to, … [i]n response to a reasonable request of any qualified beneficiary, … [p]rovide reasonably complete and accurate information as to the nature and amount of the trust property … [and] [a]llow reasonable inspections of the subject matter of the trust and the accounts and other documents relating to the trust." N.C. Gen. Stat. § 36C-8-813.

There is no question that the Trust Agreement falls within the North Carolina Uniform Trust Code. N.C. Gen. Stat. § 36C-1-102. Because the Trust Agreement is

10

governed by the North Carolina Uniform Trust Code, North Carolina Mutual is entitled to the protections provided thereunder, including N.C. Gen. Stat. §§ 36C-2-201 and 36C-8-813. Therefore North Carolina Mutual is likely to succeed on the merits of its claim for an accounting of the Trust Assets in Count I.

> **B. Based on the face of the documents presented, Port Royal and Summit breached the Trust Agreement.**

To prevail on a claim of breach of contract under North Carolina law, a plaintiff must prove "(1) existence of a valid contract and (2) breach of the terms of that contract." *Flanders Corp. v. EMI Filtration Prod. LLC*, No. 4:13-CV-00189-BR, 2014 WL 1608359, at *2 (E.D.N.C. Apr. 22, 2014) (citing *Ahmadi v. Triangle Rent A Car, Inc.*, 691 S.E.2d 101, 103 (N.C. Ct. App.2010)).[1]

The Trust Agreement represents a valid contract between North Carolina Mutual, Summit, and Port Royal. North Carolina Mutual has alleged that Summit has breached the Trust Agreement by, *inter alia*, (i) investing the Trust Assets in non-Eligible Assets, and/or (ii) accepting for deposit into the Trust Account certain assets that are non-negotiable, and (iii) by failing to obtain North Carolina Mutual's written consent prior to permitting the substitution of North Carolina Mutual's cash for other assets. (Compl. ¶¶ 97, 101, 103.) North Carolina Mutual has alleged that Port Royal breached the Trust Agreement by (i) permitting Trust Assets that are neither negotiable nor Eligible Assets, and (ii) by investing the Trust Assets in securities that were in violation of Section 4(f)

---

[1] The Trust Agreement is governed by North Carolina law pursuant to Section 12 of the Trust Agreement.

11

and Section 11 of the Trust Agreement. (Compl. ¶¶ 92, 94.) These breaches arise from obligations found in the express language of the Trust Agreement, and therefore Summit and Port Royal cannot contend that they are not subject to those obligations.

North Carolina Mutual is likely to succeed on its claim for breach of the Trust Agreement because the Trust Assets, on their face, do not fall within Section 4(f) and Section 11 of the Trust Agreement, are not "Eligible Assets," and are not negotiable. For example, the statements provided by Summit to the North Carolina Insurance Commissioner show that some of the Trust Assets are invested in a Promissory Note purportedly executed between Forefront Talking Capital Investment, LLC/Rudare Communications, SL-Tata Communications and Port Royal (Ex. B to September 9, 2016 letter from Summit to N.C. Dept. of Insurance at 2 of 3.) The Forefront Entities subsequently provided a copy of the $1,000,000 Forefront Talking Capital Investment, LLC/Rudare Communications, SL-Tata Communications Promissory Note (a copy of which is attached hereto as **Exhibit K**). The Promissory Note expressly states that it is "non-negotiable," in violation of Section I(C) of the Trust Agreement. Moreover, the Forefront Talking Capital Investment, LLC/Rudare Communications, SL-Tata Communications Promissory Note is not an Eligible Asset under the Trust Agreement because, at a minimum, it (i) does not fall within the investment guidelines of N.C. Gen. Stat. § 58-7-173; (ii) is not an appropriate duration or maturity after consideration of the duration of the reinsured liabilities; and/or (iii) does not have an average rating of a 2 or better (or any rating) based upon the ratings of the NAIC's Security Valuation Office

12

("SVO"). Moreover, Summit permitted the substitution of the cash in the Trust Account into these assets without prior written consent from North Carolina Mutual, as required under Sections 2(d) and 4(c) of the Trust Agreement.

Similarly, the Forefront Income Trust, in which approximately one-third of the Trust Assets are allegedly invested (i) does not fall within the investment guidelines of N.C. Gen. Stat. § 58-7-173; (ii) is not an appropriate duration or maturity after consideration of the duration of the reinsured liabilities, as it is illiquid; and/or (iii) does not have an average rating of a 2 or better (or any rating) based upon the ratings of the NAIC's Security Valuation Office ("SVO"). Moreover, it does not fall within the concentration limitations prescribed by the North Carolina Insurance Code, as it represents 30% of the Trust Assets. As such, it violates the terms of the Trust Agreement.

Because the investments in which the Trust Assets are purportedly invested violate the Trust Agreement on their face, North Carolina Mutual is likely to succeed on the merits of its claim for breach of the Trust Agreement (Count II).

### C. Based on the documents received from Defendants, Stamford Brook breached the Investment Advisory Agreement.

Regarding Plaintiff's claim for breach of the Investment Advisory Agreement, in addition to showing the likelihood of a breach, North Carolina Mutual must also show it was a third-party beneficiary of the agreement. To do so under North Carolina law, Plaintiff must prove "(1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct,

and not incidental, benefit of the plaintiff." *Pearson v. Gardere Wynne Sewell LLP*, 814 F. Supp. 2d 592, 601 (M.D.N.C. 2011) (quoting *Holshouser v. Shaner Hotel Group Props., One Ltd. Pshp.*, 134 N.C.App. 391, 400, 518 S.E.2d 17, 25 (1999)).[2] The third factor, which is most relevant to the present case, focuses on the intent of the contracting parties. *Id*. In determining the intent of the contracting parties, the court should consider the circumstances surrounding the transaction as well as the actual language of the contract. *Id*.

The Investment Advisory Agreement is a fully-executed contract between Port Royal and Stamford Brook, which is valid and enforceable. It was executed for the direct benefit of North Carolina Mutual, as the sole purpose of the agreement is to manage the investment of funds for which North Carolina Mutual is the sole beneficiary. That the retention of Stamford Brook is explicitly referenced in the Trust Agreement further evidences the parties' intent to benefit North Carolina Mutual. Stamford Brook was well-aware that it was investing the Trust Assets on behalf of North Carolina Mutual, as evidenced by an April 24, 2015 letter from Reifler to North Carolina Mutual, attached hereto as **Exhibit L**. North Carolina Mutual is therefore likely to prevail on its claim that it is a third-party beneficiary of the Investment Advisory Agreement.

For the same reason that North Carolina Mutual is likely to prevail on its claim for breach of the Trust Agreement, it is likely to prevail on its claim in Count III for breach of the Investment Advisory Agreement. North Carolina Mutual has alleged that

---

[2] Pursuant to Section 16 of the Investment Advisory Agreement, the agreement is governed by North Carolina law.

Stamford Brook breached the Investment Advisory Agreement by investing the Trust Assets in non-Eligible Assets, as defined by the Investment Advisory Agreement and Trust Agreement. (Compl. ¶ 114.) North Carolina Mutual further alleged that Stamford Brook breached the Investment Advisory Agreement by failing to act as a fiduciary of the Trust Assets and failing to operate under the prudent-man rule in regard to the Trust Assets by, *inter alia*, investing the Trust Assets in non-Eligible Assets and/or assets that were otherwise inappropriate, speculative, and/or non-negotiable; and by investing the Trust Assets in loans made to affiliates of the Forefront Entities. (Compl. ¶¶ 116, 117.)

As outlined above, on their face, many of the investments in the Trust Account do not qualify as Eligible Assets under the Trust Agreement or N.C. Gen. Stat. § 58-7-173. Moreover, Stamford Brook invested the majority of the Trust Assets into entities or investments directly belonging to or benefitting the Forefront Entities or their affiliates, in direct breach of its fiduciary obligations as defined in Section 12 of the Investment Advisory Agreement. (*See e.g.*, Promissory note made by Forefront Partners, LLC, payable January 25, 2016, attached hereto as **Exhibit M**.) Accordingly, North Carolina Mutual is likely to succeed on the merits of its claim for breach of the Investment Advisory Agreement in Count III.

    **D.**    **The Forefront Entities', Reifler's, and Flatley's actions are an obvious breach of their fiduciary duty.**

North Carolina Mutual is also likely to prevail on its claims against the Forefront Entities, Reifler, and Flatley for breach of fiduciary duty (Count IV). Under North Carolina law, to "state a claim for breach of fiduciary duty, a plaintiff must allege that a

15

fiduciary relationship existed and that the fiduciary failed to act in good faith and with due regard to [plaintiff's] interests." *Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, 394 F. Supp. 2d 762, 771 (M.D.N.C. 2005) (citing *Toomer v. Branch Banking & Trust Co.*, 171 N.C.App. 58, 614 S.E.2d 328, 337 (2005). A fiduciary relation is said to exist wherever "a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004) (internal quotations omitted); *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931) (internal quotation marks omitted).

As evidenced by the April 24, 2015 letter (attached as **Exhibit L**) and the September 12, 2016 correspondence from counsel for the Forefront Entities (attached as **Exhibit I**), the Forefront Entities cannot dispute that Forefront was the investment advisor for the Trust Assets, and therefore owed North Carolina Mutual a fiduciary duty. Also based on these communications, Forefront cannot deny that they were aware that North Carolina Mutual was a mutual insurance company under the laws of North Carolina, and as such Forefront knew (or at a minimum should have known) that they were required to invest the Trust Assets in investments that comport with N.C. Gen. Stat. § 58-7-173.[3] Their failure to do so is a breach of fiduciary duty.

---

[3] Also attached hereto, as **Exhibits N** and **O** respectively, are letters dated July 13, 2016 and September 1, 2016, which further evidence that the Forefront Entities were, in fact, the Investment Advisors for the Trust Assets, as well as their knowledge that North Carolina Mutual was a mutual life insurance company under North Carolina law.

16

Moreover, even if the Forefront Entities were not a party to the Investment Advisory Agreement, they were aware of the terms of the Investment Advisory Agreement—as evidenced by the fact that David Wasitowski, Chief Operating Officer of Forefront Capital, at a minimum, edited and emailed the agreement to Port Royal—and therefore were well aware of their obligation to invest the Trust Assets within a certain class of investments.[4]  This, combined with the fact that the Forefront Entities invested the Trust Assets primarily in investments that benefitted the Forefront Entities, Reifler, and/or Flatley, and loaned Trust Assets to entities affiliated with the Forefront Entities, clearly show that the Forefront Entities, Reifler, and Flatley failed to act in good faith and with due regard to North Carolina Mutual's interests, and therefore North Carolina Mutual is likely to succeed on the merits of its breach of fiduciary duty claim as well.

## II. North Carolina Mutual will Suffer Irreparable Harm Absent an Injunction.

Injunctive relief is proper where the plaintiff lacks a legal remedy for imminent irreparable harm. *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (noting that irreparable harm generally is found where the movant suffers a harm that cannot be compensated by monetary damages).  Where the failure to grant preliminary relief threatens the movant's ability to continue doing business, the irreparable harm prong is met. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994)); *Newlife Homecare Inc. v. Express Scripts, Inc.*, No. 3:07CV761, 2007 WL 1314861 (M.D. Pa.

---

[4] See email attached hereto as **Exhibit P**.

17

May 4, 2007). Moreover, "[c]onduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company may . . . constitute irreparable harm." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114–15 (2d Cir. 2003).

Pursuant to N.C. Gen. Stat. § 58-7-75, a mutual insurance company is required to possess a certain level of reserve assets. Those assets, however, must be invested in a limited class of investments enumerated in N.C. Gen. Stat. § 58-7-173. Should the North Carolina Commissioner of Insurance determine that the Trust Assets are in violation of N.C. Gen. Stat. § 58-7-173, "the Commissioner shall disallow, in whole or in part, the amount of the asset that is prohibited…." N.C. Gen. Stat. § 58-7-197. Moreover, "[i]n any determination of the financial position of the insurer, that amount shall be deducted as a nonadmitted asset of the insurer." *Id*.

More importantly, to the extent that the Trust Assets are determined to be non-admissible under N.C. Gen. Stat. § 58-7-173, the Commissioner of Insurance could disallow those assets, and ultimately enter an order for the rehabilitation or liquidation of North Carolina Mutual. N.C. Gen. Stat. § 58-7-75(10). For this reason, absent the requested preliminary injunction, North Carolina will suffer irreparable harm.

### III.  The Balancing of the Equities Favors Entry of an Injunction.

Where issuing the injunction merely requires a defendant to do that which the defendant agreed to do by contract (and is required under North Carolina law), the equities tip in favor of the issuance of the injunction. *See Int'l Fid. Ins. Co. v. Waterfront*

18

*Grp. NC, LLC*, No. 3:11-CV-00116-W, 2011 WL 4715155, at *5 (W.D.N.C. Oct. 6, 2011); *Atl. Diving Supply, Inc. v. Moses*, No. 2:14CV380, 2014 WL 3783343, at *12 (E.D. Va. July 31, 2014).

Here, North Carolina Mutual merely seeks information regarding the manner in which the Trust Assets are invested, and to ensure those assets are, in fact, invested as required by statute and contract. North Carolina Mutual is entitled to this information under both the Trust Agreement and under North Carolina law, and to the extent the assets have been invested improperly, requiring Defendants to return the Trust Assets to Eligible Assets merely enforces the express agreements and North Carolina law, and protects the public-at-large. Accordingly, the balancing of the equities leans heavily in North Carolina Mutual's favor.

**IV.     The Public Interest is Served by Issuing the Injunction.**

It is well established that the public interest is best served when parties are required to abide by their agreements. *Williams v. Bimbo Foods Bakeries Distribution, Inc.*, No. 3:10-CV-167-DCK, 2010 WL 1994847, at *5 (W.D.N.C. May 18, 2010); *Int'l Fid. Ins. Co.*, 2011 WL 4715155, at *5. Moreover, the public interest is also well-served by enforcing the law. *Wilson v. Thomas*, No. 5:14-CV-85-BO, 2014 WL 7405462, at *3 (E.D.N.C. Dec. 23, 2014); *Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010).

Again, North Carolina Mutual merely seeks information to which it is entitled under both the Trust Agreement and under North Carolina law. Moreover, to the extent

19

Defendants failed to abide by the contracts and North Carolina law, enforcing both the law and the express terms of the contracts would further serve the public interest by protecting those in the public who have policies issued by North Carolina Mutual.

## CONCLUSION

WHEREFORE, North Carolina Mutual Life Insurance Company requests this Court issue a Preliminary Injunction requiring Defendants to provide a full accounting of all Trust Assets, including sufficient documents and information to determine whether the assets are Eligible Assets and/or fully negotiable. To the extent that the Trust Assets are determined not to be Eligible Assets, North Carolina Mutual further requests an order that Defendants liquidate, redeem, or otherwise exchange the assets into cash (or some other Eligible Asset) within 90 days; and that all accounts containing Trust Assets be frozen to preclude Defendants from transferring or otherwise encumbering the Trust Assets.

NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY,

By: _____/s/_____
M. Keith Kapp
N.C. Bar No. 8850
Aaron G. Spencer
N.C. State Bar No. 26762
Post Office Box 1000
Raleigh, North Carolina 27602
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
kkapp@williamsmullen.com
agspencer@williamsmullen.com
*Attorneys for Plaintiff*