UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
CIVIL ACTION NO. 1:16-cv-01174-LCB-JEP

| | | |
|---|---|---|
| NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY, a North Carolina corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | **MEMORANDUM IN** |
| v. | ) ) | **OPPOSITION TO MOTION** **FOR PRELIMINARY** |
| STAMFORD BROOK CAPITAL, LLC, a Delaware limited liability company, *et al.* | ) ) ) | **INJUNCTION** |
| Defendants. | ) ) | |

## Preliminary Statement

This action stems from a contract among Plaintiff North Carolina Mutual Life Insurance Company ("North Carolina Mutual" or "NCM"), and co-defendants Port Royal Reassurance Company SPC Limited ("Port Royal") and Summit Trust Company ("Summit Trust"). At issue is $34 million of life insurance reserves (the "Funds") that North Carolina Mutual gave to Port Royal to invest with Summit Trust, which serves as trustee under a trust agreement reached on April 23, 2015 ("Trust Agreement").[1]

Non-party Forefront Partners, LLC ("Forefront Partners"), and its members, all located in Manhattan, became involved because Forefront Partners agreed with Port Royal, located in Maryland, to provide unique investment opportunities to Port Royal. Port Royal considered the investment suggestions made by Forefront Partners and

---

[1]        (*See* Complaint, Ex. A)

1

determined which ones to execute. Port Royal, through its sole member, Steven Fickes, approved, and knew of, all of the Funds' investments. The investments made with the Funds are in various collateralized notes receivable, payable on varying dates, many of which mature over the next several months. Based on those investments in debt instruments, NCM received, as Port Royal instructed, distributions of $1.524 million over five consecutive quarters starting June 30, 2015.

North Carolina Mutual failed to pay attention to the investments or insist on compliance with the Trust Agreement. As such, it now wants to know how Port Royal invested the Funds because the North Carolina Department of Insurance has apparently inquired about it in connection with an audit, and advised North Carolina Mutual that the investments may not satisfy North Carolina's statutes governing liquidity of insurance reserves. Forefront Partners' members have been thrust into this dispute because Port Royal, Summit Trust, and North Carolina Mutual, the three parties to the Trust Agreement, belatedly discovered over a year ago that its investments, though profitable, **and all approved by Port Royal,** may not have been compliant with North Carolina insurance statutes or regulations. Those three parties did not follow their own safeguards under the Trust Agreement (*e.g.* securing NCM's approval) to prevent the very scenario they now face.

In a misguided effort to cast blame on Forefront Partners (and its affiliates and members) for NCM's own non-compliance with insurance requirements in North Carolina, NCM largely relies on a few selected documents attached to its complaint. Those records were forged. Forefront Partners, Stamford Brook Capital, LLC, Bradley

Reifler and Michael Flatley ("Forefront parties")[2] have no contractual or fiduciary relationship with North Carolina Mutual.

NCM asserts in its complaint that Port Royal and Summit Trust breached their contractual obligations to NCM – not because any moneys have been lost – but because, as stated, the investments that Port Royal made with Forefront Partners do not meet North Carolina's laws regarding liquidity for life insurance reserves. As such, NCM seeks an accounting and mandatory injunctive relief far beyond an accounting or maintaining the *status quo.* The Forefront related parties have no objection to a *status quo* order or a full accounting, and are cooperating with NCM to achieve that end.

But any mandatory preliminary injunction beyond an accounting is premature, implicates non-parties, and does not lie under settled principles of equity jurisprudence. NCM is just starting to look into the investments at issue and their liquidity. The investments are not readily liquid or in the Forefront parties' hands to enable them to convert the investments into cash. They are debt investments made by non-parties, all with varying maturity dates.

NCM cannot meet its burden to satisfy the factors examined to obtain a mandatory, preliminary injunction. Not only are material facts in dispute (and admittedly unclear to NCM), but irreparable harm has not been shown. Also, the equities

---

[2] Forefront Capital Holdings, LLC, Bradley Reifler ("Reifler"), Stamford Brook Capital Holdings, LLC and Michael Flatley ("Flatley") are all referred to collectively as "Forefront parties." As shown on the Delaware Department of State, Division of Corporations' website, Forefront Capital LLC, joined as a defendant in error, was formed in 2008, before Reifler opened Forefront Partners LLC, and is an entity that has no connection to the Forefront parties. As such, the undersigned does not and cannot represent "Forefront Capital, LLC."

also do not tip in NCM's favor.  Nor does the public benefit from any mandatory injunction.  The thrust of the motion (and complaint) is NCM's allegation that the Department of Insurance **might** one day take unspecified action against NCM because the Funds may not be compliant with North Carolina law governing reserve fund liquidity.  Because the Funds are not in "eligible assets," NCM speculates what **potentially could** happen at some future date. Such speculation does not warrant the extreme relief of a mandatory injunction that inevitably would implicate the rights of non-party borrowers not before this Court.

**STATEMENT OF FACTS**

**Background**

In or about 2014, Steven Fickes at Port Royal and Forefront Partners' members, Reifler and Flatley, discussed entering into a joint venture to acquire and/or invest roughly $34.1 million of a reserve portfolio to be held at Summit Trust for the benefit of North Carolina Mutual.  In a memorandum dated December 1, 2014 that Fickes sent to Reifler and Flatley, Fickes memorialized the framework and intention of the joint venture.  *See* Reifler Declaration dated October 26, 2016 ["Reifler Decl."] in opposition to NCM's motion for a mandatory preliminary injunction, Ex. A.  He wrote that Port Royal/ Fickes would oversee administration of the reinsurance transaction with NCM; deal with insurance regulators; and provide all guidance regarding "the asset fit with regulatory/prudent man standards."   Port Royal/Fickes was to be the "go-to guy for all things insurance and/or actuarial."  (Id. at 3). Similarly, in an email dated December 4, 2014, Fickes wrote Forefront Partners stating that Fickes at Port Royal had consulted

4

with counsel who "sent [him] copies of all investment statutes for NC [and that he] know[s] enough to start reviewing these tonight to make sure we can get the pieces to fit together." (Reifler Decl., Ex. B). Investment advisors routinely take on the responsibility of compliance with investment statutes. (Reifler Decl., ¶ 2). The role of Forefront Partners, on the other hand, was to simply "create/find appropriate assets for investment." (Reifler Decl., Ex. A at 3).

Fickes, Reifler and Flately continued to communicate via email and verbally towards consummating the joint venture. No joint venture agreement per se was ever executed but the parties performed under their agreement. In that regard, Flatley and Reifler learned that Fickes had consummated the transaction with North Carolina Mutual and Summit Trust under the Trust Agreement dated April 23, 2015. (Complaint, Ex. A) As part of the joint venture with Port Royal, Forefront Partners wired $4.25 million to Wells Fargo on April 27, 2015 as part of its funding obligation to provide $6.0 million in the joint venture. (Reifler Decl. Ex. C).

**The Initial Investments**

Accordingly, funds were then sent from Summit Trust in April 2015 to various investments introduced by Forefront Partners and approved by Fickes at Port Royal. All investments, as now urged by NCM, should have been approved by NCM. Forefront Partners and its members (Flatley and Reifler) had little to no communication with NCM or Summit Trust, and had no obligation to advise NCM of what Summit Trust and Port Royal were doing. Reifler and Flatley reported all activity concerning the Funds to, and got all approvals and direction from, Steven Fickes at Port Royal. (Reifler Decl.,¶ 4)

5

The Funds' investments were made in various notes receivable. This included notes signed by Forefront Partners directly, and $10 million invested in Forefront Income Trust, a publically traded closed-end mutual fund that invests in high-yield loan instruments. (Reifler Decl.,¶ 5)   It has 28 investors in addition to Port Royal.  Its stock symbol is BFITX.   This publically traded fund gives 3% of the portfolio to military families and veterans, has outperformed its peers, and is in the top six of similar funds for having the best risk adjusted returns. (Reifler Decl., ¶5).  Reifler serves as a member of Forefront Capital Advisors, LLC, the registered investment advisor to Forefront Income Trust.  Redemption rights of all shareholders in Forefront Income Trust are governed by the prospectus. (Reifler Decl., ¶5, Ex. D)[3]

All of the Funds were invested in debt instruments with varying maturity dates. No investment is immediately liquid.  However, some of the Funds are coming due in the coming weeks and months, and in addition to providing full disclosures, the Forefront parties are exploring all means to provide liquidity as soon as possible. (Reifler Decl. ¶ 6.)

NCM joined Stamford Brook Capital LLC as a defendant.  Initially, Fickes and Reifler contemplated Reifler setting up a new entity to serve as an investment advisor for the joint venture called Stamford Brook Capital, LLC.  However, since Port Royal knew monies were to be steered to various investments in which Forefront Partners or its affiliates had an interest, Reifler saw an inherent conflict by him having any interest in

---

[3]    As shown in the prospectus, the investor must expect that the investment will not be liquid (Reifler Dec., Ex.  D at 1), but that the Trust is authorized to repurchase a percentage of its outstanding shares on a quarterly basis.    (Id. at 41.)

any investment advisor. (Reifler Decl. ¶7.) Consequently, though Stamford Brook Capital LLC was formed in Delaware months before the portfolio was acquired, no operating agreement for that LLC was ever created and it never did any business or signed any documents.

Indeed, the validity of the so-called investment advisory agreements relied on by NCM purportedly signed by Stamford Brook Capital are disputed. There are two versions of an "investment advisory agreement" attached as Exhibits B and C to the complaint that purport to be with Stamford Brook Capital. The latter "agreement" actually misspells Reifler's name on the signature page. Reifler never signed these documents. (Reifler Decl., ¶ 8). He retained a handwriting expert as a result of the false accusations made in this litigation. That expert determined in a report issued on October 13, 2016 that the signatures contained on the documents upon which NCM relies are not Reifler's. (Id., ¶ 9, Ex. E) That expert also concluded that there is no signature of Forefront's CFO, David Wasitowski, as falsely alleged in the complaint, Memorandum of law in support, and supporting declaration from Steven Fickes of co-defendant Port Royal. (See NCM's Complaint, ¶ 30, Memorandum of Law in Support at 6, and Fickes Decl., ¶ 4, falsely asserting that Wasitowski signed the Investment Advisory Agreement).

The unauthentic signatures and documents don't end there. On April 24, 2015, Fickes emailed Flatley and asked him to have a document, dated April 24, 2015, to be mailed to NCM, signed by Reifler on behalf of Forefront Capital. (Reifler Decl., Ex. F) The signature line states the name David Wasitowski. As stated in n. 2 above, neither Reifler nor Wasitowski have an interest or control in any company called "Forefront

7

Capital, LLC."   Reifler has entities under his control bearing the name Forefront, such as Forefront Partners, LLC and Forefront Capital Services, LLC, all created for distinct purposes, but he controls no LLC called "Forefront Capital, LLC," a defendant incorrectly joined in this action.  Notably, the letterhead used by the Forefront entities *doing business as* Forefront Capital, bears a distinct legend and logo (*see* Reifler Decl. Ex. G) **whenever** they use the name Forefront Capital.  (Reifler Decl., ¶10).  That authentic letterhead, when compared with the fabricated letterhead upon which NCM relies in this action (*see* Complaint Exs, E and F; Reifler Decl., Ex. F) plainly shows that the letterheads NCM relies upon are not something the Forefront parties would ever use. (Reifler Decl., ¶10).

In its complaint, North Carolina Mutual alleges that the investment advisory agreement, as shown in an email from Wasitowski, was drafted in part by Stamford Brook.  (Complaint, ¶ 39)   That is not correct.  (Reifler Decl., ¶11). Wasitowski may have commented on it for Forefront Partners before the concept was abandoned, but he had nothing to do with finalizing it as falsely suggested.  (Id., ¶11).

All financial accounting, investments, extensions, and payments in and out of the Funds were done with Port Royal's approval and direction.  All spreadsheets and periodic disclosures concerning the investments to NCM were done by Fickes at Port Royal so that Port Royal would report to NCM as per the NCM-Port Royal-Summit Trust contractual relationship.  (Reifler Decl., ¶12).   Thus, for each of the five quarters from June 30, 2015 through June 30, 2016, Fickes provided the detail and instructed Forefront Partners how much money to pay NCM in distributions generated from the Funds'

8

investments. (Reifler Decl. ¶ 12, Ex. H). Those distributions to NCM totaled $1.524 million. In an email dated May 11, 2015, he also provided the Forefront parties with a breakdown of the fees to be paid, including $175,000 in fees paid to Port Royal for its part in the transaction. (Id., ¶13, Ex., I) After the second quarter in 2015, Fickes also prepared an accounting, presumably shared with NCM and Summit Trust, showing where all of the Funds had been invested, stating that he will "file the second quarter statement with the regulators." (Id., ¶ 14, Ex. J). On July 22, 2015, Fickes emailed Flatley and stated that the attached spreadsheet was a "cleaned up accounting" that Fickes would provide to NCM. (Reifler Decl., ¶ 15, Ex. K).

**Port Royal Alerts Forefront Partners to its Mistake**

On or about August 5, 2015, Fickes contacted Forefront Partners and stated that, as shown in the accounting and various schedules Fickes had prepared, some investments were not permitted under North Carolina law. (Reifler Decl., ¶ 16, Ex. L). Fickes told Forefront Partners for the first time that the rules in North Carolina require that the investments in mortgaged-back debt and/or long-term investments made with insurance reserves must be spread out in separate instruments so that no more than 10% of the portfolio is invested in any one instrument. Fickes told Forefront Partners that the Funds had to be reallocated to comply with North Carolina law. (Reifler Decl., ¶ 16). Reifler told Fickes in response that they would do whatever was feasible to convert the assets as soon as possible but that it could take time. (Reifler Decl. ¶ 16). As stated, liquidity of the $10 million of Funds invested in Forefront Income Trust is governed by the prospectus and applicable securities laws. The separate $10 million of Funds invested

9

with Forefront Partners were loaned to various parties, some backed by mortgages or other collateral, where the maturity dates, as extended, have not arrived. (Reifler Decl., ¶ 16)[4]

In assisting Port Royal to meet its obligations to NCM, Forefront Partners gave Fickes projections as to what Forefront Partners would propose be done. The Forefront parties never represented that the assets had been converted. (Reifler Decl., ¶ 18).

On September 10, 2015, Fickes emailed Forefront Partners stating that "other than" the $1.75 MM loan to Forefront Partners (bearing a yield of 28.5% and secured by its pledged interest in Symmetry Property Development, LLC), Fickes "[thought] we have the first Summit account almost cleaned up." (Reifler Decl., ¶ 19, Ex. M). On October 14, 2015, after Reifler told Fickes that some of the money cannot be readily "swapped," Fickes wrote Reifler saying "this sucks" and that Fickes wanted to get "out of the middle." (Reifler Decl., ¶ 19, Ex. N).

Fickes nonetheless remained at the helm and emailed Forefront Partners on November 10, 2015, attaching a reconciliation statement he had prepared to show that the investments were "eligible." (Reifler Decl., ¶ 20, Ex. O). Fickes stated in that email that he "assumed" the assets were "moved" into other investments. (Id). At no time did Forefront Partners confirm that Fickes' post-conversion projections or "assumptions" had been made. (Id., ¶20). In yet another email dated November 10, 2015, Fickes told

_____

[4]     Fickes never complained about any extension on any Forefront notes because he was advised of each investment and each extension. Thus, NCM's allegations that the Forefront parties were acting without authorization and solely in their self-interest is a complete falsehood. (Reifler Decl. ¶ 17).

Forefront Partners that "investments must roll immediately from one into another with no gaps." (Id., Ex. P).

NCM alleges in the Complaint that, based on documents that Forefront Partners' lawyers recently provided directly to NCM's lawyers as requested, there was a loan extension to Forefront Partners, and dividend payment of $495,048 generated from Forefront Income Trust, that was reinvested with Forefront Partners, both alleged to be without authorization. (Complaint, ¶¶ 45(B); 57). These allegations are false. (Reifler Decl., ¶ 21) The money was collected from an investment, deposited, and reinvested **all with Port Royal's full approval and consent.** (Id., ¶ 21) The loan to Forefront Partners was likewise extended at a higher rate ab initio, as is the borrower's right, with Port Royals' approval and consent. (Reifler Decl., ¶ 21).

By June 2016, the assets had been partially spread out among different instruments as Fickes had wanted. Currently, the Funds are now housed in nine baskets, reflected on the spreadsheet attached to NCM's moving papers (see Memorandum of law in Support of Plaintiff's Motion, Ex. I). That list was provided by the Forefront parties' New York counsel and emailed to NCM's attorney on September 12, 2016 as part of their ongoing good faith disclosure/liquidation efforts. (Reifler Decl., ¶ 22).

## ARGUMENT

## NORTH CAROLINA MUTUAL'S MOTION FOR A MANDATORY PRELIMINARY INJUNCTION SHOULD BE DENIED

"A preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power that is only to be employed in the limited circumstances that

11

demand it. Whether to grant this relief is in the sound discretion of the court." Capital Associated Industries, Inc., v. Cooper, 129 F.Supp.3d 281 (M.D.N.C. 2015) (Biggs, J.) "Courts generally employ preliminary injunctions for the limited purpose of preserving the status quo during the course of litigation in order to prevent irreparable harm and to preserve the ability of the court to render meaningful relief on the merits." Id. at 288. The party seeking a preliminary injunction bears the burden of justifying such relief.

To prevail on a motion for preliminary injunction, a party must establish "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." Id. at 288 "[A] clear showing" of likelihood of success on the merits and irreparable harm is required in addition to satisfying the other factors before a preliminary injunction can be entered. Id.at 288; accord, BNC Bancorp v. BNCCORP, Inc., 2016 WL 3365428 (June 16, 2016, M.D.N.C. 2016) ("The party seeking a preliminary injunction bears the burden of making a "clear showing" it is entitled to such relief.")

If the facts are disputed, the Court should not decide a motion for preliminary injunction on the papers. The motion should be denied. At minimum, an evidentiary hearing is required to see if Plaintiff can meet its burden of proof. "While an evidentiary hearing is not always required before resolving a preliminary injunction, Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1175-76 (3d Cir. 1990) (describing various scenarios in which a hearing would be unnecessary), [the Third Circuit] ha[s] noted that it "may be improper to resolve a preliminary injunction motion on a paper record alone;

12

[and] where the motion turns on a disputed factual issue, an evidentiary hearing is ordinarily required." Arrowpoint Capital Corp. v. Arrowpoint Asset Management, 793 F. 3d 313 (3d Cir. 2015) (citing Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 719, n.16 (3d Cir. 2004).

When the preliminary injunction is mandatory rather than prohibitory in nature, the Fourth Circuit has stated that the "application of this exacting standard of review is even more searching." Pashby v Delia, 709 F.3d 307 (4th Cir 2013). In other words, there is a more heightened standard of proof to obtain preliminary injunctive relief when a mandatory injunction rather than when a *status quo* injunction is requested.

I.      **The Forefront Parties Will Continue to Cooperate and have no Objection to an Accounting**

As stated above, there is no dispute that North Carolina Mutual is entitled to know where the Funds went and the status of the investments. Port Royal should be taking the lead on that effort. The Forefront parties' attorneys have been working with NCM's lawyers and will continue to provide information as requested. There is no objection to entry of an order to that effect.

But the entry of an order in any way interfering with the investments is inappropriate and could create substantial damage to others not before this Court. There is no evidence that any investment is in peril or that the value of the investments may be lost. Moreover, any interference with Forefront Income Trust, not a party here, could backfire to everyone's detriment. Reifler is making efforts to grow the mutual fund, which in turn means, under the prospectus, that the ability to redeem greater amounts will

be realized as the mutual fund grows. Conversely, any interference with the fund would have the opposite effect and impact the rights of the other investors who could face forced liquidation, loss of return on investments, and loss of principal. The best course for all is to leave the investments where they are, and if Port Royal chooses to redeem its investment in Forefront Income Trust, then that should be done as permitted under the governing prospectus.

II. **North Carolina has failed to meet its Burden to show by Clear Evidence all of the Elements Required to Obtain a Mandatory Preliminary Injunction**

   A. **Irreparable Harm Has Not been Shown**

The subject of this action is money. If North Carolina Mutual has the Funds in hand, which will be the case in a matter of time, it has no claim. By definition, then, this case does not give rise to irreparable harm. Money will be the proper remedy, if at all. NCM, by analogy, stands in the shoes of an individual investor claiming that the broker did not follow his investment instructions to put the funds in cash or cash equivalents and that decision might cause further consequences at some point in the future. That does not amount to irreparable harm. An action for money damages lies, if any.

More to the point, NCM's argument is entirely speculative. NCM argues:

Pursuant to N.C. Gen. Stat. § 58-7-75, a mutual insurance company is required to possess a certain level of reserve assets. Those assets, however, must be invested in a limited class of investments enumerated in N.C. Gen. Stat. § 58-7-173. *Should* the North Carolina Commissioner of Insurance determine that the Trust Assets are in violation of N.C. Gen. Stat. § 58-7-173, "the Commissioner shall disallow, in whole or in part, the amount of the asset that is prohibited…." N.C. Gen. Stat. § 58-7-197. Moreover, "[i]n any determination of the financial position of the insurer, that amount shall be deducted as a non-admitted asset of the insurer."

(NCM's Mem. of Law at 18) (emphasis added).

This argument says nothing of any imminent harm. It merely states what may be possible.

NCM continues its argument nonetheless:

> More importantly, to the extent that the Trust Assets are determined to be non-admissible under N.C. Gen. Stat. § 58-7-173, the Commissioner of Insurance *could* disallow those assets, and ultimately enter an order for the rehabilitation or liquidation of North Carolina Mutual. N.C. Gen. Stat. § 58-7-75(10). For this reason, absent the requested preliminary injunction, North Carolina will suffer irreparable harm.

NCM's argument is based on pure supposition. Irreparable harm has not been shown. On the requirement that the movant establish irreparable harm, the showing must be clear. The Supreme Court in Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008), rejected a standard that allowed the plaintiff to demonstrate only a "possibility" of irreparable harm because that standard was "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." The Real Truth About Obama, Inc. v. Federal Election Commission, 575 F.3d 342 (4th Cir. 2009). NCM's argument is built on "possibilities."

In Hughes Network Systems, Inc. v. InterDigital Communications Corp., 17 F.3d 691 (4th Cir. 1994), the Fourth Circuit stated that a preliminary injunction is not normally available where the harm at issue can be remedied by money damages. Id. at 693-94. However, the Court stated that, "[e]ven if a loss can be compensated by money damages . . . , extraordinary circumstances may give rise to the irreparable harm required for a

15

preliminary injunction." Id. at 694. Such circumstances may exist where, for example, "the moving party's business cannot survive absent a preliminary injunction or where damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." Id. (internal quotations marks and alterations omitted). In the narrow circumstances in which preliminary injunctions are warranted despite the adequacy of money damages, injunctions are "carefully tailored, generally operating simply to preserve the plaintiff's opportunity to receive an award of money damages at judgment." Id.

There is no showing here that any defendant cannot satisfy a money judgment in NCM's favor were the Funds to dissipate. Nor is there any showing that NCM faces the inability to "survive" as a business absent a preliminary injunction. Instead, NCM alleges that the Department of Insurance "could" or "might" take decisive measures, such as liquidation. But given that North Carolina Mutual has been in existence for over a century, it is very unlikely that any agency would order liquidation. At no time has North Carolina Mutual asserted that it is in danger of not meeting its obligations to policy holders or that it is probable the company will be placed into liquidation. Given that the Funds' investments were made more than a year ago, and that North Carolina has reaped a profit through cash distributions paid to date from the Funds' investments, North Carolina is hard pressed to assert that it is now facing the inability to survive.

The cases NCM cites are inapposite. For example, it cites Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546 (4th Cir. 1994) (NCM's Mem of Law at 17). There, the defendant disconnected cable services to various

16

customers of plaintiff. The court issued a preliminary injunction that prohibited the defendant from operating under the exclusive provider agreements at issue, and allowed plaintiff to reconnect its cable service to those tenants whose leases had not expired and who desired reconnection. This case is not remotely on point. Defendants have not interfered with NCM's customers. NCM also relies on <u>Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd.</u>, 339 F.3d 101 (2d Cir 2003) (NCM's Mem of Law at 18). The Second Circuit there dealt with a contractual right between beer companies that gave plaintiff certain power in management of a joint venture. The Second Circuit wrote, in enjoining defendants from proceeding with certain business dealings with Beck's beer:

> This is not to say that all bargained-for contractual provisions provide a basis for injunctive relief upon breach or threatened breach; such a broad holding would eviscerate the essential distinction between compensable and non-compensable harm. We hold only that the denial of bargained-for minority rights, standing alone, may constitute irreparable harm for purposes of obtaining preliminary injunctive relief where such rights are central to preserving an agreed-upon balance of power (e.g., preserving the management role of the minority directors) in corporate management.

339 F.3d at 114.

The facts here are not remotely similar. There is no balance of power or bargained for rights in management at issue in this case. The only alleged harm is what a state agency might one day do because the Funds, which were invested in debt instruments almost a year and a half ago, and are not sufficiently liquid to comply with North Carolina state law.

**B.** **North Carolina has Not shown a Likelihood of Success on the Merits as against the Forefront parties**

The tripartite relationship at issue among NCM, Summit Trust and Port Royal shows that there was never privity between the Forefront parties and NCM. For that reason, NCM asserts that the Forefront parties have engaged in tortious conduct by breaching a fiduciary duty owed to NCM. But the only links to any Forefront party and NCM to try to hold them responsible for NCM's state law obligation to invest its assets in conformity with North Carolina law are based upon two flawed conclusions.

First, NCM argues that "[s]ometime after April 24, 2015, and unbeknownst to North Carolina Mutual, representatives of the Forefront Entities, presumably relying on the Fraudulent Investment Advisory Agreement, invested virtually all of North Carolina Mutual's cash into investments that were either directly or indirectly linked to the Forefront Entities. (NCM's Mem of Law in Support at 7, citing Lawrence Decl., ¶ 10.) The first fatal flaw in NCM's position is that all investments – those to Forefront entities and otherwise – were made with Port Royal's consent and approval, the sole party from whom Forefront Partners took instruction and direction. As such, no duty has been breached to give rise to any claim against the Forefront parties.

Second, NCM links the Forefront parties to this dispute with Port Royal and Summit Trust based solely upon selected documents that NCM cannot authenticate and which the Forefront parties never signed. The documents are not genuine.

As such, NCM is unable to show that it is likely that the Forefront parties have a duty to NCM, that they breached a fiduciary obligation owed to NCM, and that such

18

"fiduciary" obligation compelled them to invest the Funds in conformity with North Carolina state insurance law.

### C.     <u>The Balance of the Equities do not Favor North Carolina Mutual</u>

NCM also fails to satisfy the prong that the equities lie in its favor. The Funds were undisputedly invested by Port Royal in April 2015. Yet, NCM only now comes to Court, 18 months later, asking for emergent equitable relief. It received $1.5 million in distributions. The Department of Insurance has opened a file on the matter, but that does not give rise to the extraordinary remedy of a mandatory, preliminary injunction.

As stated above, the Forefront parties will fully cooperate to help NCM satisfy its obligations under North Carolina law. The conversion to cash will occur as soon as practicable. But the harm granting any injunction against the Forefront parties could jeopardize and interfere with the rights of others not before the Court, including the Forefront Income Trust's public investors, or the other obligors who borrowed the remaining portions of the Funds from Port Royal. Any interference could also have negative ramifications on the Funds' value.

Indeed, NCM has made no explanation to show why it cannot generate capital elsewhere to meet its state law financial obligations.

The Forefront parties are not from North Carolina nor are they in the insurance industry. The relationship that brought the Forefront parties to this arrangement was Port Royal's Steven Fickes, who agreed that he would oversee and address all insurance related issues. Regulatory issues regarding the composition of reserves was not the Forefront parties' responsibility.

19

D.    **The Public Interest does not weigh in North Carolina Mutual's Favor**

The Funds that Port Royal invested in must await cash conversion. Notes receivable are convertible to cash when the obligation matures. A note could be discounted and sold ahead of the maturity date *if* the note was publically traded, as true with the bond market. But the notes in question are not publically traded and thus are not convertible to cash before the maturity dates.

Any order compelling the Forefront parties to take any steps in violation of the applicable instruments and agreements with obligors and the public prospectus concerning Forefront Income Trust would be unprecedented and unwarranted. NCM cites no case for such extraordinary relief. There are 28 other shareholders in Forefront Income Trust besides Port Royal. Any grant of the relief requested in "seizing" the Funds as NCM suggests on this motion could violate the public shareholders' rights. Under federal securities laws, any distribution to one shareholder must be made to all. See, e.g., 26 U.S.C. § 562.

As for members of the public who have a life insurance policy with NCM, NCM has not made any showing that it cannot pay the policy holders. As stated, the Funds have been invested with defendants since April 2015. The Funds will all be repaid and liquidated as quickly as possible.

## CONCLUSION

For the foregoing reasons, North Carolina Mutual's motion should be denied.

20

This the 26th day of October, 2016.

                              SMITH, ANDERSON, BLOUNT, DORSETT,
                              MITCHELL & JERNIGAN, L.L.P.


                              By:    /s/ J. Mitchell Armbruster
                                     James K. Dorsett, III
                                     State Bar No. 7695
                                     J. Mitchell Armbruster
                                     State Bar No. 26422
                                     Post Office Box 2611
                                     Raleigh, North Carolina 27602-2611
                                     Telephone:    (919) 821-1220
                                     Facsimile:    (919) 821-6800
                                     E-Mail: jdorsett@smithlaw.com
                                                marmbruster@smithlaw.com


                                     *Attorneys for Defendants*
                                     *Forefront   Capital   Holdings,   LLC,*
                                     *Stamford Brook Capital, LLC*
                                     *Bradley Cole Reifler*
                                     *Michael Flatley*

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

M. Keith Kapp
Aaron G. Spencer
Williams Mullen
301 Fayetteville St., Suite 1700
Raleigh, NC 27601
Telephone: 919-981-4024
Fax: 919 981-4300
Email: kkapp@williamsmullen.com.com

   This the 26th day of October, 2016.

              /s/J. Mitchell Armbruster
              J. Mitchell Armbruster