# Exhibit

# 16

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
TALKING CAPITAL LLC, together with its subsidiaries
TALKING CAPITAL PARTNERS II, LLC,
TALKING CAPITAL PARTNERS III, LLC, and
FOREFRONT PARTNERS LLC

Index No.: 650973/2017

Plaintiffs,

    – against –

**VERIFIED AMENDED**
**COMPLAINT**

RODNEY OMANOFF, OMANOFF AMERICA
TELECOM, LLC, BRENDAN ROSS, MARK PROTO,
MUDMONTH, LLC, JOSEPH RAHMAN a/k/a
YOUSSEF RAHMAN, CHRISTOPHER LARA,
INTOUCH TELECOM, INC., DLI TC, LLC,
VOIP GUARDIAN PARTNERS I LLC,
VOIP GUARDIAN LLC, DIRECT LENDING
INVESTMENTS LLC, and DIRECT LENDING
INCOME FUND, L.P.,

Defendants.
------------------------------------------------------------------------X

    The plaintiffs herein, Talking Capital LLC, together with its subsidiaries Talking Capital

Partners II, LLC and Talking Capital Partners III, LLC (collectively, "Talking Capital") directly

and Forefront Partners, LLC ("Forefront Partners," and together with Talking Capital,

collectively, the "Plaintiffs"), directly and derivatively on behalf of Talking Capital, by their

attorneys, Goldberg Weprin Finkel Goldstein LLP, as and for their Verified Amended Complaint

against the defendants, Rodney Omanoff, Omanoff America Telecom, LLC, Brendan Ross,

Mark Proto, Mudmonth, LLC, Joseph Rahman a/k/a Youssef Rahman, Christopher Lara,

InTouch Telecom, Inc., DLI TC, LLC, VoIP Guardian Partners I LLC, VoIP Guardian LLC,

Direct Lending Investments LLC and Direct Lending Income Fund, L.P., respectfully allege as

follows:

1

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 2 of 32

## PARTIES AND BASES FOR NEW YORK JURISDICTION

1.      Talking Capital LLC and its subsidiaries Talking Capital Partners II, LLC ("TCPII") and Talking Capital Partners III, LLC ("TCPIII") are each Delaware limited liability companies, with their current principal place of business located at 641 Lexington Ave., New York, New York.

2.      Forefront Partners, LLC ("Forefront Partners") is also a Delaware limited liability company with its current principal place of business located at 641 Lexington Ave., New York, New York.

3.      Defendant Rodney Omanoff ("Omanoff") is an individual who resides in the State of New York, and maintains offices at 405 East 56th Street, New York, New York.

4.      Omanoff was a Manager of Talking Capital, and is affiliated with and controlled Omanoff America Telecom, LLC ("Omanoff America"), which was a Member of Talking Capital and its affiliates.

5.      Defendant Brendan Ross ("Ross") is a California resident who, along with his affiliated companies named herein, transacted business within the State of New York in connection with his activities involving TCP II and committed tortious acts within and outside the State of New York causing injury in New York, which subjects Ross to jurisdiction in New York.

6.      Additionally, Ross and his affiliate DLI TC LLC ("DLI TC") entered into a contract at issue in this case providing for, inter alia, their consent to the jurisdiction of the New York State courts.

7.      Defendant Mark Proto ("Proto") is a California resident who was a Manager of Talking Capital, and is affiliated with and controls Mudmonth, LLC ("Mudmonth"), which is a Member in Talking Capital and its affiliates. Proto committed tortious acts within and outside

2

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 3 of 32

the State of New York causing injury in New York, which subject Proto and Mudmonth to jurisdiction in New York.

8.     Defendant Joseph Rahman a/k/a Youssef Rahman ("Rahman") is a New Jersey resident who committed tortious acts within and outside the State of New York causing injury in New York, which subject Rahman to jurisdiction in New York.

9.     Defendant Christopher Lara ("Lara") is a California resident, who committed tortious acts within and outside the State of New York causing injury in New York, which subject Lara to jurisdiction in New York.

10.     Defendant InTouch Telecom, Inc. ("InTouch") is or was a Delaware corporation which committed tortious acts within and outside the State of New York causing injury in New York, which subject InTouch to jurisdiction in New York.

11.     Defendant DLI TC is a Delaware limited liability company formed by Ross to provide financing for TCP II, which previously consented to the jurisdiction of the courts of the State of New York.  DLI TC also committed tortious acts within and outside the State of New York causing injury in New York, which further subject DLI TC to jurisdiction in New York.

12.     Defendants VoIP Guardian LLC and VoIP Guardian Partners I LLC (collectively, "VoIP Guardian") are Delaware limited liability companies with their principal place of business at 405 East 56 Street, New York, New York 10022.

13.     Defendants Direct Lending Investments LLC and Direct Lending Income Fund, L.P., (collectively, "Direct Lending") are a California limited liability company and a Delaware limited partnership, respectively, controlled by Ross, which committed tortious acts within and outside the State of New York causing injury in New York, thereby subjecting Direct Lending to jurisdiction in New York.

3

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 4 of 32

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.    Organization of Talking Capital

14.    In early 2014, Bradley Reifler, on behalf of Forefront Partners, Omanoff, Proto and Rahman launched a specialty finance company in the telecom industry based in New York, New York, which became known as Talking Capital LLC.

15.    On March 24, 2014, Talking Capital LLC was formed by Forefront Partners, Omanoff America and Mudmonth for the specific purpose of financing telecom providers routing international calls.

16.    In forming Talking Capital LLC, Forefront Partners was a financial partner and relied on various representations made by Omanoff (individually and on behalf of Omanoff America) and others (including Proto and Rahmann) that:  (i) a strong market existed for the factoring of account receivables generated by the routing of international calls;  and (ii) Omanoff, Proto and Rahman (and Rahman's associate Lara) had wide experience in the telecommunications industry, and were able to effectively handle all day-to-day operations, including sourcing, due diligence and underwriting relating to potential clients and borrowers.

17.    On or about September 8, 2014, Talking Capital executed a formal operating agreement (the "Operating Agreement"), listing Forefront Partners LLC, Omanoff America Telecom LLC and Mudmonth LLC each as one-third members.  A copy of the Operating Agreement is annexed hereto as Exhibit A.

18.    The Operating Agreement provides that "the principal executive office of the Company shall be located at 590 Madison Avenue, 34th Floor, New York, NY 10022."

19.    At all times relevant hereto, Talking Capital's principal place of business was in New York, New York, and virtually all business operations were run out of the New York office by Omanoff and others.

4

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 5 of 32

20.     The stated purpose of Talking Capital as set forth in the Operating Agreement was, inter alia, "to provide trade finance and factoring services to small and medium-sized wholesale telecommunications carriers ("Tier 3 Carriers") that have been awarded contracts to engage in routing and termination of international calls and other communication services for major Tier 1 telecommunications carrier clients ("Tier 1 Carriers") such as Verizon, AT&T, Sprint, T-Mobile, Vodafone, British Telecom, Deutsche Telekom and their affiliates."

21.     Under Section 5.5 of the Operating Agreement, each of the managers, including Omanoff and Proto, were required to "perform [their] managerial duties in good faith, in a manner they reasonably believe to be in the best interests on the Company and its Members, and with such care as an ordinarily prudent person in a like position would use under similar circumstances."

22.     In addition, under Section 5.5, the managers, including Omanoff and Proto, further agreed that "the fiduciary duties of a Manager to the Company and its Members shall be those of a director to a corporation and its stockholders under the DGCL . . . ."

23.     Based on the Operating Agreement, Talking Capital LLC organized various affiliates including TCPII and TCPIII, under which loans were made to various borrowers. These affiliates did not have a formal operating agreement, and adopted or utilized the Operating Agreement for Talking Capital to govern their respective internal operations.

24.     From an operating perspective, each of the various members and managers of Talking Capital and its affiliates had well-defined roles, duties and obligations.

25.     Omanoff was principally in charge of managing all day-to-day operations, including procuring financing opportunities relating to overseas telecom providers and supervising Plaintiffs' New York offices.

5

26.     By contrast, Forefront Partners was largely a financial investor.  Thus, Forefront Partners concentrated its efforts on raising capital for Talking Capital and its affiliates.  In this regard, Forefront Partners utilized its contacts in the investment banking industry to raise capital to enable Talking Capital to make telecom loans and related accounts receivable financing.

**B.     Ross's and DLI TC's Funding of Talking Capital**

27.     Of direct relevance, Brad Reifler of Forefront Partners originally introduced Ross and his affiliated companies to Messers. Omanoff, Proto and Rahman as potential lenders for Talking Capital beginning in 2014.

28.     Ross came to New York on at least three occasions to meet with the representatives of Talking Capital and entered into negotiations to provide loans to Talking Capital and its affiliates.

29.     Neither Omanoff, Proto, Rahman or Lara had any prior relationship with Ross or his companies before the introduction made by Bradley Reifler.

30.     The negotiations in New York proved successful and led to a series of loans made by Ross's affiliated companies in 2014 to early 2016.

31.     The total amount of loans issued by Ross's affiliated companies amounted to approximately $180 million (including renewals and rollovers of prior financings).

32.     Given this magnitude, Ross's affiliated companies became the leading lending source for Talking Capital and its affiliates.

33.     The first set of loans were made in the fall of 2014 totaling $7 million, pursuant to two promissory notes each in the sum of $3.5 million (the "Initial Loans").  The Initial Loans were personally guaranteed by Brad Reifler of Forefront Partners.

6

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 7 of 32

34.     The funds from the Initial Loans were sent from Ross's company, Direct Lending Income Fund, L.P., to Talking Capital Partners I LLC's bank in New York.

35.     The Initial Loans were timely repaid with interest and led to a number of subsequent loans in 2015 pursuant to a certain Master Receivable Purchase and Servicing Agreement dated as of December 1, 2014, executed by TCPII as Originator, a copy of which is annexed hereto as Exhibit B (the "Loan Agreement").

36.     DLI TC (another of Ross's finance companies) made a number of additional loans to TCPII throughout 2015 pursuant to the Loan Agreement by wiring funds to TCPII's bank in New York.

37.     As lead lender for Talking Capital, Ross's companies were afforded the opportunity if they chose to finance all potential telecom loan transactions solicited or obtained by Omanoff on behalf of Talking Capital and its affiliates.

38.     These opportunities were presented and verbally communicated by Omanoff and others to Ross in the regular course of Talking Capital's business as they materialized, without formal documentation.

39.     Talking Capital operated successfully for more than a years' time, earning combined profits with its lenders and capital partners of approximately $7 million, only to see its business deteriorate as a result of the ill-fated Bolotel Transactions discussed below.

C.     **The Bolotel Transactions**

40.     In 2016, Omanoff, acting in concert with Proto, Rahman and/or Lara (singularly or in tandem, and/or individually or in a representative capacity on behalf of Omanoff America and Mudmonth), caused Talking Capital to suffer substantial losses when they imprudently made

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 8 of 32

a reckless lending decision to cause TCPIII to finance a Tier 3 European service provider known as Bolotel Limited ("Bolotel").

41.    The Bolotel financing proved to be highly speculative and resulted in more than $8 million in losses (the "Bolotel Transactions").

42.    Originally, however, the Bolotel Transactions were conceived and implemented by Omanoff, Proto, Rahman and/or Lara relating to receivables generated from routing activity with AV Partners, SRL ("AV Partners"), a European telecommunications company.

43.    Omanoff, Proto, Rahman and/or Lara structured and executed the Bolotel Transactions down to every last detail and Forefront Partners had no involvement in the underwriting or due diligence of Bolotel or AV Partners.

44.    During the period of time leading up to the Bolotel Transactions, Omanoff was in regular contact with Ross and his affiliated finance companies, and consistent with the parties' course of dealing they were presented with the opportunity to participate in the Bolotel Transactions.

45.    It was reported to Forefront Partners that Ross declined to participate in the Bolotel Transactions because the financial information associated with the Bolotel Transactions was either incomplete or inadequate and did not meet Ross's underwriting criteria.

46.    Given the subsequent events, however, it appears that Omanoff and the other individual Defendants steered Ross and his companies away from the Bolotel Transactions to protect their developing business relationship relating to a competing business discussed below.

47.    In any event, Omanoff, Proto and Rahman were responsible on behalf of Talking Capital and its affiliates to present all lending opportunities to Ross and his companies pursuant to the Loan Agreement.

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 9 of 32

**D.**   **Omanoff's, Proto's, Rahman's and Lara's Lack of Due Diligence**
**in Connection with the Bolotel Transactions**

48.    After Ross declined to become involved with the Bolotel Transactions, Summit Trust Co. ("Summit") became the funding source.

49.    TCPIII was organized and received funding from Summit to make the loans, which were supposed to be used to purchase Tier 1 carrier receivables owed by AV Partners to Bolotel Ltd (a UK Company) on a factoring basis.

50.    In reality, but previously unknown to Forefront Partners, AV Partners was a subsidiary of Logica SRL, which had been in bankruptcy since 2010. Thus, AV Partners lacked necessary creditworthiness to justify TCPIII's multimillion-dollar financing of its receivables.

51.    TCPIII's involvement in the Bolotel Transactions was undertaken at the direction of Omanoff, Proto, Rahman and/or Lara (singularly or in tandem, and individually or in a representative capacity on behalf of Omanoff America and Mudmonth), without proper or meaningful due diligence.

52.    Indeed, these individuals were absolutely derelict in their assessment of the inherent risks involved in dealing with a near-insolvent Tier 1 carrier and a speculative Tier 3 carrier.

53.    Their actions (or more appropriately inactions) constitute gross negligence in the performance their duties and responsibilities as managers and senior employees of Talking Capital and its affiliates.

54.    Case in point, the existence of the Logica bankruptcy was never brought to the attention of Forefront Partners at any time before the financing started. Thus, TCPIII effectively loaned funds to a near-insolvent company that no longer qualified as a true Tier 1 carrier.

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 10 of 32

55.    This lack of proper due diligence and underwriting on the part of Omanoff, Proto, Rahman and/or Lara wrongfully exposed TCPIII and Summit to millions of dollars of losses.

56.    Moreover, the financing surrounding the Bolotel Transactions was done so haphazardly that Omanoff, Proto, Rahman and/or Lara (singularly or in tandem, and individually or in a representative capacity on behalf of Omanoff America and Mudmonth) remitted more than $8 million from the New York bank account of TCPIII to an entity known as Bolotel FZE, which is a different company from Bolotel Ltd (the UK company).

57.    The relationship between Bolotel FZE and Bolotel Ltd is murky, but there is no disputing that more than $8 million of TCPIII's funds have since disappeared.

58.    Additionally, Rahman and Lara, operating through InTouch, were also responsible to monitor and track the level and interconnectivity of calls routed by Bolotel for between AV Partners.

59.    Rahman and Lara were responsible to monitor and track all telephone calls using an "inter-connect switch."

60.    In fact, Plaintiffs relied upon Rahman and Lara to report accurately concerning the level of activity between Bolotel and AV Partners through proper invoicing.

61.    Again, Omanoff, Proto, Rahman and/or Lara (singularly or in tandem, and individually or in a representative capacity on behalf of Omanoff America and Mudmonth) failed in this function as well, leading to the fraudulent dissipation of TCPIII's funds.

62.    Indeed, the tracking and invoicing by Rahman, Lara and InTouch were plagued by material inaccuracies and, upon information and belief, were intentionally inflated and falsified so as to induce significant overpayments and/or over-extensions of credit by TCPIII to Bolotel.

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 11 of 32

63.     While the initial smaller loans to Bolotel were repaid without default, the last two sets of loans of more than $8.5 million made by TCPIII to Bolotel quickly went into default without any explanation by Omanoff, Proto, Rahman and/or Lara as to the reasons for the sudden delinquency, and loss of communication.

64.     As of February 2016, Bolotel virtually became invisible, with no trace of the funds, leading to a default on the balance of TCPIII's loan indebtedness totaling $8,525,286.86 plus accrued interest (the "Bolotel Loans").

65.     Based upon Forefront Partners' ensuing investigation, it now appears that the payments on the initial loans were designed as part of a fraudulent enterprise to lull TCPIII into a false sense of security regarding continued financing despite Bolotel's otherwise shaky financial condition.

66.     By early 2016, Bolotel mysteriously ceased operating, again without any explanation by Omanoff, Proto, Rahman and/or Lara as to what happened to its business or assets.

67.     To this day, no explanation has been received as to the cause of Bolotel's cessation of business, and the unpaid Bolotel loans are completely unaccounted for by Omanoff, Proto, Rahman and/or Lara.

68.     There is a growing sense that Bolotel and/or AV Partners is a criminal enterprise, making use of a web of international bank accounts to divert, loot or embezzle the loan proceeds from TCPIII.

69.     Omanoff, Proto, Rahman and/or Lara (singularly or in tandem, and individually or in a representative capacity on behalf of Omanoff America and Mudmonth), without authorization, bypassed Talking Capital's customary practice of sending funds through an

11

escrow company called DealDefenders LLC ("DealDefenders"), which provides secure escrow services in the telecommunications industry.

70.     Instead, Omanoff, Proto, Rahman and/or Lara (singularly or in tandem, and individually or in a representative capacity on behalf of Omanoff America and Mudmonth) wired funds directly to Bolotel FZE, which is a separate legal entity from Bolotel, which is based in the United Arab Emirates.

71.     TCPIII had no direct agreement or relationship with Bolotel FZE, and the decision by Omanoff, Proto and Rahman to wire funds directly to Bolotel FZE effectively eliminated any protection provided by DealDefenders, and facilitated the diversion, looting or embezzlement.

72.     Moreover, Forefront Partners has since learned from the Kroll Investigatory Service that, upon information and belief, Omanoff's partners, Proto and Rahman (and Rahman's entity InTouch), have previously been involved in significant wrongdoing in the telecommunications industry involving creating phony receivables.

73.     The decision to lend millions of dollars to Bolotel, without any due diligence or effort to investigate the history and creditworthiness of Bolotel and AV Partners, constitutes gross negligence by Omanoff, Proto and Rahman in the performance of their respective duties and responsibilities as managers of Talking Capital and its affiliates.

74.     Bolotel is now the subject of insolvency proceedings in the High Court of Justice (Chancery Division) in Southampton, England, with doubtful chances of recovering any amounts lost.

75.     The Bolotel Transactions were disastrous and have caused substantial financial harm to TCPIII plus significant reputational damage to Talking Capital and its affiliates.

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 13 of 32

### E.    Defendants Improperly Establish a Competing Business.

76.    Besides the harm caused by the Bolotel Transactions, Omanoff, Proto, Rahman and Lara, individually or acting in a representative capacity on behalf of Omanoff America and Mudmonth, compounded the damages when they improperly opened and established a competing business known as VoIP Guardian.

77.    VoIP Guardian LLC and VoIP Guardian Partners I LLC (collectively, "VoIP Guardian") are Delaware limited liability companies formed on September 28, 2015 and October 9, 2015, respectively—approximately the same time as the ill-fated Bolotel Transactions commenced.

78.    Omanoff and his cohorts utilized Ross and his companies to finance loans made by VoIP Guardian. Thus, not only did Omanoff and the other individual Defendants breach their contractual and fiduciary duties to Plaintiffs by opening a competing business, they took TCPII's main lender into their web of wrongdoing.

79.    Ross and his affiliated companies, however, were not free to change allegiances so freely, as their involvement in VoIP Guardian violated the restrictions contained in the terms of the Loan Agreement executed by TCPII with Ross and his affiliated lending company, DLI TC.

80.    VoIP Guardian lists its business address as the same address at which Omanoff resides, to wit, 405 East 56th Street, New York, New York.

81.    As the name suggests, VoIP Guardian is engaged in the identical business as Talking Capital, to wit, providing financing to telecommunications carriers utilizing voice over internet protocol ("VoIP").

F.    **The Restrictive Covenants**

82.    Under the terms of the Loan Agreement, DLI TC and its members, representatives and agents (including Ross) became subject to certain express and bargained-for restrictive covenants for a period of two years, as set forth in Section 18 thereof.

83.    Ross was a signatory to the Loan Agreement and became personally bound by the restrictive covenants under Section 18 by virtue of the fact that he was a member, representative and agent of DLI TC.

84.    The restrictive covenants, inter alia, prevent and preclude Ross or any of his affiliated companies from engaging in a competing business involving financing or factoring services to telecommunications carriers in connection with voice over internet protocol. Such services are defined under the Loan Agreement as VoIP services, which bear the same name as the competing business, "VoIP Guardian."

85.    Under Section 18(b)(ii) of the Loan Agreement, Ross agreed that he and his entities

> shall not, and shall ensure that each of its Representatives shall not (A) disclose or reveal any Originator Confidential Information to any person other than a Buyer Representative who is actively and directly involved in Buyer's investment activity in reviewing Receivables originated by the Originator for potential purchase ... or (B) use the Originator Confidential Information for any purpose other than the Agreement Purpose.

86.    Under Section 18(c) of the Loan Agreement:

> [Ross] agrees, and shall cause each of its Representatives to agree, that it shall maintain the confidentiality of any information and documents delivered to Buyer to the extent required therein, to the extent required by applicable law (including, without limitation, privacy and credit reporting laws) and to the same extent as if Buyer were a party to the Credit Documents . . . .

14

87.     Under Section 18(d) of the Loan Agreement:

For the period beginning on the date of this Agreement and continuing through two (2) years following the termination date of this Agreement (the "Restricted Period"), except in connection with its activities under this Agreement, [DLI TC, together with Ross as Buyer and Representative] shall not, and shall ensure that each of its Representatives does not, engage or have an interest, alone or in association with others, as principal, director, manager, officer, employee, agent, partner, member, stockholder, or through the investment of capital, lending of money or property, rendering of services or otherwise, in any business providing trade finance or factoring services to telecommunications carriers in connection with voice over internet protocol (VoIP services).

88.     Under Section 18(e) of the Loan Agreement:

During the Restricted Period, [DLI TC, together with Ross as Buyer and Representative] shall not, and shall ensure that each of its Representatives does not, directly or indirectly, on behalf of any of them or any other Entity: (i) solicit or induce any Merchant, Customer or Obligor to terminate, or reduce the scope of, its business relationship with the Originator or any of its Representatives; (ii) recruit or otherwise solicit or induce any person who is an employee of, or otherwise engaged by, the Originator or any of its Representatives to terminate his or her employment or other relationship with the Originator or any of its representatives or (iii) hire any person who has left the employ of the Originator or any of its Representatives during the preceding nine (9) months.

89.     Section 18(f) of the Loan Agreement provides that:  (i) the restrictions set forth in Section 18 of the Loan Agreement are necessary and reasonable;  (ii) monetary damages would not provide an adequate remedy for a breach of Section 18;  (iii) any breach or threatened breach shall entitle the non-breaching party to injunctive and other equitable relief to secure enforcement of Section 18 (in addition to any other available remedies);  and (iv) the non-breaching party shall be entitled to recover all reasonable attorneys' fees and expenses incurred in enforcing these provisions.

15

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 16 of 32

**G.**    **Identical Nature of VoIP Guardian's Business**

90.    In the fall of 2016, Talking Capital discovered for the first time through an intermediary in the industry that Omanoff, Proto, Rahman, Lara and Ross had established or were associated with another telecommunications factoring business operating under the name "VoIP Guardian."

91.    As noted above, VoIP Guardian directly competes with Talking Capital in violation of Section 18 of the Loan Agreement, and in violation of Omanoff's, Proto's and Rahman's respective fiduciary obligations.

92.    The use of Ross and his affiliated companies to provide financing for the competing business was particularly galling, given that: (i) Talking Capital's relationship with Ross was initiated by Forefront Partners and Brad Reifler; and (ii) Ross and his affiliated companies only agreed to loan funds to Talking Capital based upon Brad Reifler's guarantee of the first loan of $7 million.

93.    Plaintiffs learned through third parties that Omanoff promoted VoIP Guardian as a telecom finance business funding telecommunication carriers. Omanoff explained to a potential lender that the VoIP Guardian business was identical to Talking Capital's business and provided the same type of financing for telecom carriers using Voice over Internet Protocol (VoIP) technology.

94.    Omanoff created the competing VoIP Guardian business while he was still a member and manager of Talking Capital and its subsidiaries.

95.    Both VoIP Guardian LLC and VoIP Guardian Partners I LLC were formed almost a year prior to Omanoff's October 10, 2016 resignation from Talking Capital and at a time when both Omanoff and Proto were managers of Talking Capital.

Case 1:16-cv-01174-LCB-JEP  Document 118-16  Filed 10/01/18  Page 17 of 32

96.     Moreover, VoIP Guardian uses the same New York address and telephone number as those used by Omanoff while he was a member of Talking Capital.

97.     The formation of a competing business violates Omanoff's, Proto's and Rahman's respective fiduciary duties to Plaintiffs and corresponding obligations of loyalty and fidelity arising out of their status as managers and senior executives of Talking Capital.

98.     Upon information and belief, VoIP Guardian is now being operated in New York by Omanoff, Proto, Rahman and Lara (directly or indirectly) with financial support from Ross, to engage in virtually the identical business of Talking Capital, namely, the financing of receivables generated by carriers engaged in the routing of international calls.

99.     Ross, operating through various affiliated entities, became a prime lending source to VoIP Guardian despite the restrictive covenants under the Loan Agreement with TCPII.

100.    The VoIP Guardian business improperly competes with TCPII in violation of Section 18 of the Loan Agreement.

101.    Defendants continue to use Talking Capital's Confidential Information (as defined in the Loan Agreement) to compete with Talking Capital and its affiliates, in violation of the Loan Agreement and Omanoff's, Proto's and Rahman's fiduciary obligations arising out of their status as managers and senior executives of Talking Capital.

102.    Omanoff's, Proto's and Rahman's establishment and/or involvement with VoIP Guardian as a competing business constitutes a flagrant breach of their fiduciary duties as members and/or managers of Talking Capital, and also violates the express non-compete provisions binding on Ross and his affiliated entities.

103.    Upon information and belief, Lara knowingly and intentionally assisted Omanoff, Proto and Rahman to: (i) breach their fiduciary duties as described herein; and (ii) violate the

17

non-compete provisions binding on Ross and his affiliated entities by helping to form the VoIP Guardian business.

104.    As a result of their pervasive wrongdoing, the Defendants are jointly and severally liable to Plaintiffs for a myriad of damages including reimbursement of TCPIII's business losses arising out of the Bolotel Transactions, together with lost business and profits diverted from Talking Capital and TCPII through the operation of VoIP Guardian, the exact amount of which requires a full and complete accounting, but is believed to be at least $25 million.

### H.    Forefront Partners' Standing to Bring Derivative Claims

105.    Forefront Partners alleges herein certain derivative claims in the right and for the benefit of Talking Capital and its affiliates TCPII and TCPIII to redress injuries suffered and to be suffered by those entities as a result of Defendants' breaches of fiduciary duties and contractual obligations.

106.    With respect to the derivative claims, Forefront Partners has not made a pre-suit demand on Talking Capital and its affiliates TCPII and TCPIII because a demand would be futile and is excused as a matter of law.

107.    The members of Talking Capital are Forefront Partners, Omanoff America and Mudmonth, and the initial Managers of Talking Capital were the representatives of the member entities, to wit, Bradley Reifler, Omanoff and Proto respectively. Rahman was identified in the Operating Agreement as the "Tax Matters Partner."

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 19 of 32

108.    However, Omanoff resigned from Talking Capital and therefore has no right to participate in any decision by Talking Capital or its affiliates regarding whether to pursue the claims set forth herein.[1]

109.    Although Proto and Rahman have not formally resigned, they have not only abandoned their posts at Talking Capital but also flagrantly violated their contractual and fiduciary obligations to Plaintiffs as set forth herein and, as such, are liable to Talking Capital and its affiliates for substantial damages.

110.    Indeed, this lawsuit challenges numerous decisions made by Proto and Rahman, and their coconspirators (Omanoff, Lara, InTouch, Ross, DLI TC, Direct Lending Income Fund, Direct Lending Investments and VoIP Guardian) including, without limitation, the decisions to cause TCPIII to undertake the Bolotel Transactions and to wrongfully form the competing VoIP Guardian business in violation of their obligations to Talking Capital and TCPII.

111.    As such, Proto and Rahman are irreconcilably conflicted with respect to any decision by Talking Capital, TCPII or TCPIII to bring claims against them or their entity Mudmonth and/or their coconspirators Omanoff, Lara, InTouch, Ross, DLI TC, Direct Lending Income Fund, Direct Lending Investments and VoIP Guardian.

112.    In light of this debilitating conflict of interest, it would be futile for Forefront Partners to make any pre-suit demand upon Proto or Rahman with respect to the derivative claims asserted herein and, therefore, any pre-suit demand is excused.

113.    In prosecuting the derivative claims, Forefront Partners will adequately and fairly represent the interests of Talking Capital and its affiliates TCPII and TCPIII in enforcing and vindicating their rights.

---

[1]    In any event, demand on Omanoff would be excused as futile for the same reasons that demand would be futile with respect to Proto and Rahman.

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 20 of 32

## FIRST CAUSE OF ACTION
### (Breach of Contract – Directly and Derivatively on Behalf of Talking Capital, TCPII and TCPIII Against Omanoff, Omanoff America, Proto, Mudmonth and Rahman)

114. Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 113 above, with the same force and effect as though more fully set forth at length herein.

115. Forefront Partners and Omanoff (through Omanoff America), Proto (through Mudmonth) and Rahman conducted business pursuant to the Operating Agreement governing the affairs of Talking Capital and its wholly-owned subsidiaries TCPII and TCPIII, which conferred contractual rights and obligations among the parties.

116. In furtherance of the Operating Agreement, Forefront Partners agreed with Omanoff, Omanoff America, Proto, Mudmonth and Rahman to establish Talking Capital and its affiliate companies in New York and perform the following activities:

  a. Leased office space in New York;

  b. Hired employees in New York;

  c. Sought out both borrowers and capital sources, to engage in the purchase of Telecom Receivables;

  d. Retained professionals;

  e. Created business plans, proprietary software and models; and

  f. Opened and maintained bank accounts in New York.

117. All of these efforts and expenditures were undertaken by Forefront Partners, Talking Capital and its affiliates in reliance upon the obligations of Omanoff, Omanoff America, Proto, Mudmonth and Rahman to honor their commitments and perform under the Operating Agreement.

118. Omanoff, Omanoff America, Proto, Mudmonth and Rahman breached the Operating Agreement by, inter alia, committing gross negligence in the performance of their

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 21 of 32

supervisory responsibilities regarding the Bolotel Transactions and engaging in a competing business in New York known as VoIP Guardian, utilizing proprietary and confidential information owned and developed by Plaintiffs.

119.    By reason of the foregoing, Talking Capital, TCPII and TCPIII, directly and derivatively, are entitled to money damages against Omanoff, Omanoff America, Proto, Mudmonth and Rahman, jointly and severally, for breaches of their duties under the Operating Agreement, in an amount to be determined at trial following a complete accounting, but in no event less than $25,000,000 in the aggregate, together with attorneys' fees, interest and the costs and disbursements of this action, and requiring Defendants Omanoff, Omanoff America, Proto, Mudmonth and Rahman to disgorge and forfeit any membership interest in any of the Plaintiffs, whether held directly or indirectly.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty – Directly on Behalf of Forefront Partners and Directly and**
**Derivatively on Behalf of Talking Capital, TCPII and TCPIII Against Omanoff, Omanoff**
**America, Proto, Mudmonth and Rahman)**

120.    Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 119 above, with the same force and effect as though more fully set forth at length herein.

121.    Pursuant to the Operating Agreement, Omanoff, Omanoff America, Proto, Mudmonth and Rahman were charged with fiduciary duties of loyalty, integrity, honesty and fidelity to Talking Capital and its affiliates and members, with heightened standards since Omanoff, Proto and Rahman supervised the day-to-day operations for the company.

122.    The Operating Agreement governed the affairs of Talking Capital as well as its wholly-owned subsidiaries TCPII and TCPIII.

123.    The fiduciary duty of loyalty commands, inter alia, that Omanoff, Omanoff America, Proto, Mudmonth and Rahman not engage in competing business transactions or any

21

activities that undermine the business or business opportunities of, inter alia, Forefront Partners, Talking Capital, TCPII or TCPIII.

124.     As fiduciaries, Omanoff, Omanoff America, Proto, Mudmonth and Rahman were also obligated to make full disclosure to Forefront Partners, Talking Capital and its affiliates TCPII and TCPIII of all material facts affecting the business and to safeguard the assets of the company and not to engage in high-risk transactions, particularly without full, complete and proper due diligence.

125.     Plaintiffs, in their dealings with Omanoff, Omanoff America, Proto, Mudmonth and Rahman, relied upon Omanoff, Omanoff America, Proto, Mudmonth and Rahman to fulfill their fiduciary obligations to Plaintiffs and to provide dedicated and loyal service consistent with commercial standards of fidelity.

126.     Omanoff, Omanoff America, Proto, Mudmonth and Rahman violated their fiduciary duties in several material respects.  First, they exposed TCPIII to debilitating losses by involving the company in inordinately risky lending without proper due diligence concerning the Bolotel Transactions, which were funded through TCPIII's New York bank account.

127.     Second, Omanoff, Proto and Rahman further violated their fiduciary duties to Forefront Partners, Talking Capital and TCPII when they effectively "jumped ship" to improperly engage in a competing business in New York, to wit, VoIP Guardian, utilizing the confidential and proprietary business information, structure and models developed by Talking Capital and with knowledge of Ross' non-compete obligations.

128.     The violations of fiduciary duty have caused substantial financial harm to Forefront Partners, Talking Capital, TCPII and TCPIII, and have exposed them to considerable losses.

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 23 of 32

129.    By reason of the foregoing, Forefront Partners, directly, and Talking Capital, TCP II and TCPIII, directly and derivatively, are entitled to money damages against Omanoff, Omanoff America, Proto, Mudmonth and Rahman, jointly and severally, for breach of their fiduciary duties in an amount to be determined at trial following an accounting, but in no event less than $25,000,000 in the aggregate, together with attorneys' fees, interest and the costs and disbursements of this action, and requiring Defendants Omanoff, Omanoff America, Proto, Mudmonth and Rahman to disgorge and forfeit any membership interest in any of the Plaintiffs, whether held directly or indirectly.

### THIRD CAUSE OF ACTION
**(Aiding and Abetting Breaches of Fiduciary Duty – Directly on Behalf of Forefront Partners, and Directly and Derivatively on Behalf of Talking Capital, TCPII and TCPIII Against Lara and InTouch)**

130.    Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 129 above, with the same force and effect as though more fully set forth at length herein.

131.    Omanoff, Proto and Rahman breached their fiduciary duties in several material respects as set forth above, including, inter alia, involving TCPIII in the Bolotel Transactions, paying Bolotel based on phony reporting, and forming a competing business.

132.    Lara knowingly and intentionally helped, participated in and provided substantial assistance to Omanoff's, Proto's and Rahman's breaches of their fiduciary duties by:  (i) facilitating the Bolotel Transactions, including, without limitation, acting as a primary contact with Bolotel and AV Partners and providing inflated tracking information and invoices for payment to Bolotel; and (ii) working with Omanoff, Proto and Rahman to form the competing business operating in New York.

23

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 24 of 32

133.    In addition, InTouch knowingly and intentionally helped, participated in and provided substantial assistance to Omanoff's, Proto's and Rahman's breaches of their fiduciary duties by providing inflated tracking information and invoices for payment to Bolotel.

134.    Lara's and InTouch's misconduct in aiding and abetting Omanoff's, Proto's and Rahman's breaches of fiduciary duties has damaged Forefront Partners, Talking Capital, TCPII and TCPIII in the same manner as Omanoff's, Proto's and Rahman's direct breaches of their fiduciary duties.

135.    Lara and InTouch at all times knew or should have known that their misconduct in aiding and abetting Omanoff's, Proto's and Rahman's breaches would cause substantial damage to Forefront Partners, Talking Capital, TCPII and TCPIII in New York.

136.    By reason of the foregoing, Forefront Partners directly, and Talking Capital, TCPII and TCPIII, directly and derivatively, are entitled to money damages against Lara and InTouch, jointly and severally, for aiding and abetting breaches of fiduciary duty, in an amount to be determined at trial following an accounting, but in no event less than $25,000,000 in the aggregate, together with attorneys' fees, interest and the costs and disbursements of this action.

**FOURTH CAUSE OF ACTION**
**(Misappropriation of Corporate Opportunity and**
**Unjust Enrichment – Directly and Derivatively on Behalf of Talking Capital and TCPII**
**Against Omanoff, Omanoff America, Proto, Mudmonth and Rahman)**

137.    Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 136 above, with the same force and effect as though more fully set forth at length herein.

138.    During the time that Talking Capital and TCPII did business, Omanoff, Omanoff America, Proto, Mudmonth and Rahman, in acts of overt self-dealing and abject dishonesty, diverted corporate opportunities from Talking Capital and TCPII.

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 25 of 32

139. The diverted and misappropriated corporate opportunities came to Omanoff, Omanoff America, Proto, Mudmonth and Rahman in connection with their positions at Talking Capital and, specifically, consisted of the secret agreement between Omanoff, Proto and Rahman and Ross (and his affiliated entities) to engage in a competing business based in New York known as VoIP Guardian.

140. In the absence of Defendants' actions relating to the competing business, VoIP Guardian would not exist and Talking Capital and TCPII would have the benefit of all of the transactions that Omanoff, Omanoff America, Proto, Mudmonth, Rahman and Ross and his affiliated companies subsequently engaged in and are continuing to pursue.

141. By reason of the foregoing, Talking Capital and TCPII, directly and derivatively, are entitled to money damages against Omanoff, Omanoff America, Proto, Mudmonth and Rahman, jointly and severally, for misappropriation of corporate opportunities and unjust enrichment in an amount to be determined at trial following an accounting, but in no event less than $25,000,000 in the aggregate, together with attorneys' fees, interest and the costs and disbursements of this action, and requiring Defendants Omanoff, Omanoff America, Proto, Mudmonth and Rahman to disgorge and forfeit any membership interest in any of the Plaintiffs, whether held directly or indirectly.

## FIFTH CAUSE OF ACTION
### (Breach of Restrictive Covenant – Directly and Derivatively on Behalf of TCPII Against Ross and his affiliated entities DLI TC and Direct Lending)

142. Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 141 above, with the same force and effect as though more fully set forth at length herein.

143. The non-competition provisions set forth in Section 18 of the Loan Agreement prohibit Ross and his affiliated companies, including DLI TC and Direct Lending as an affiliate

25

Case 1:16-cv-01174-LCB-JEP   Document 118-16   Filed 10/01/18   Page 26 of 32

of DLI TC, from competing with TCPII in the business of providing trade finance or factoring services to telecommunications carriers in connection with voice over internet protocol.

144.    As an affiliate of DLI TC and Ross, Direct Lending is also bound by the non-competition provisions set forth in Section 18 of the Loan Agreement.

145.    Ross' election to provide funding to Omanoff and the New York-based VoIP Guardian business, as set forth above, constitutes a material knowing and flagrant breach of the covenants not to compete set forth in Section 18 of the Loan Agreement.

146.    As a result thereof, TCPII has suffered, and will continue to suffer, severe financial injury, which constitutes irreparable injury under the Loan Agreement, because of the loss of business and business opportunities.

147.    Ross, DLI TC and Direct Lending, are all jointly and severally guilty of breach of the restrictive covenants.

148.    By reason of the foregoing, TCPII, directly and derivatively, is entitled to money damages against Ross and his affiliated entities, DLI TC and Direct Lending, jointly and severally, for breach of the restrictive covenants, in an amount to be determined at trial following an accounting, but in no event less than $25,000,000 in the aggregate, together with attorneys' fees, interest and the costs and disbursements of this action.

**SIXTH CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty**
**– Directly on Behalf of Forefront Partners and Directly and Derivatively on behalf of**
**Talking Capital and TCPII Against Ross**
**and his affiliated entities DLI TC and Direct Lending)**

149.    Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 148 above, with the same force and effect as though more fully set forth at length herein.

26

150.    Omanoff, Proto and Rahman breached their fiduciary duties in several material respects as set forth above, including, inter alia, forming a competing business based in New York.

151.    Ross and his affiliated entities DLI TC and Direct Lending, jointly and severally, knowingly and intentionally helped, participated in and provided substantial assistance to Omanoff's, Proto's and Rahman's breaches of their fiduciary duties by involving themselves in the competing VoIP Guardian business.

152.    In so doing, Ross knew or should have known that his misconduct would cause substantial damages to Forefront Partners, Talking Capital and TCPII.

153.    The misconduct of Ross and his affiliated entities in aiding and abetting Omanoff's, Proto's and Rahman's breaches of fiduciary duties has damaged Talking Capital and TCPII in the same manner as Omanoff's, Proto's and Rahman's direct breaches of their fiduciary duties.

154.    By reason of the foregoing, Forefront Partners, directly, and Talking Capital and TCPII, directly and derivatively, are entitled to money damages against Ross and his affiliated entities, DLI TC and Direct Lending, jointly and severally, for aiding and abetting breaches of fiduciary duty, in an amount to be determined at trial following an accounting, but in no event less than $25,000,000 in the aggregate, together with attorneys' fees, interest and the costs and disbursements of this action.

## SEVENTH CAUSE OF ACTION
### (Permanent Injunction – Directly on Behalf of Forefront Partners and Directly and Derivatively on behalf of Talking Capital, TCPII and TCPIII Against All Defendants)

155.    Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 154 above, with the same force and effect as though more fully set forth at length herein.

27

156.    The fiduciary obligations arising out of the Operating Agreement, combined with the non-compete provisions of Section 18 of the Loan Agreement, preclude all of the Defendants, together with their agents and representatives, from competing with Talking Capital or its affiliates TCPII and TCPIII in the business of providing trade finance or factoring services to telecommunications carriers in connection with voice over internet protocol.

157.    Forefront Partners, Talking Capital and its affiliates TCPII and TCPIII have suffered, and will continue to suffer, irreparable injury inasmuch as Defendants' operation of VoIP Guardian is deemed irreparable injury within the meaning of the Loan Agreement.

158.    Based on the foregoing, Forefront Partners, directly, and Talking Capital and its affiliates TCPII and TCPIII, directly and derivatively, are entitled to a permanent injunction enjoining, restraining and prohibiting each of the Defendants from, inter alia, having any direct or indirect interest, alone or in association with others, as principal, director, manager, officer, employee, agent, partner, member, stockholder, or through the investment of capital, lending of money or property, rendering of services or otherwise, in any business providing trade finance or factoring services to telecommunications carriers in connection with voice over internet protocol (VoIP services).

WHEREFORE, Plaintiffs demand judgment as follows:

(a)     On the First Cause of Action, judgment against Omanoff, Omanoff America, Proto, Mudmonth and Rahman, jointly and severally, in an amount to be determined at trial, but in no event less than $25,000,000, together with attorneys' fees, interest and the costs and disbursements of this action, and requiring Defendants Omanoff, Omanoff America, Proto, Mudmonth and Rahman to disgorge and forfeit any membership interest in any of the Plaintiffs, whether held directly or indirectly.

(b)     On the Second Cause of Action, judgment against Omanoff, Omanoff America, Proto, Mudmonth and Rahman, jointly and severally, in an amount to be determined at trial, but in no event less than $25,000,000, together with attorneys' fees, interest and the costs and disbursements of this action, and requiring Defendants Omanoff, Omanoff America, Proto, Mudmonth and Rahman to disgorge and forfeit any membership interest in any of the Plaintiffs, whether held directly or indirectly.

(c)     On the Third Cause of Action, judgment against Lara and InTouch, jointly and severally, in an amount to be determined at trial, but in no event less than $25,000,000, together with attorneys' fees, interest and the costs and disbursements of this action.

(d)     On the Fourth Cause of Action, judgment against Omanoff, Omanoff America, Proto, Mudmonth and Rahman, jointly and severally, in an amount to be determined at trial, but in no event less than $25,000,000, together with attorneys' fees, interest and the costs and disbursements of this action, and requiring Defendants Omanoff, Proto, Rahman and Lara to disgorge and forfeit any membership interest in any of the Plaintiffs, whether held directly or indirectly.

(e)     On the Fifth Cause of Action, judgment against Ross and his affiliated entities, DLI TC and Direct Lending, jointly and severally, in an amount to be determined at trial, but in no event less than $25,000,000, together with attorneys' fees, interest and the costs and disbursements of this action.

(f)     On the Sixth Cause of Action, judgment against Ross and his affiliated entities, DLI TC and Direct Lending, jointly and severally, in an amount to be determined at trial, but in no event less than $25,000,000, together with attorneys' fees, interest and the costs and disbursements of this action.

(g)     On the Seventh Cause of Action, a permanent injunction enjoining, restraining and prohibiting each of Defendants from, inter alia, having any direct or indirect interest, alone or in association with others, as principal, director, manager, officer, employee, agent, partner, member, stockholder, or through the investment of capital, lending of money or property, rendering of services or otherwise, in any business providing trade finance or factoring services to telecommunications carriers in connection with voice over internet protocol (VoIP services).

29

Dated: New York, New York
June 16, 2017

Goldberg Weprin Finkel Goldstein LLP
*Attorneys for the Plaintiffs*
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By: */s/ Kevin J. Nash, Esq.*
    Kevin J. Nash, Esq.
    A Member of the Firm

30

## VERIFICATION

STATE OF NEW YORK    )
                       ) ss.:

COUNTY OF NEW YORK  )-

     Bradley Reifler, being sworn, says: I am a non-member manager of Talking Capital LLC and its affiliates, as well as a non-member manager of Forefront Partners LLC. I have read the foregoing Verified Amended Complaint and I know the contents thereof and the same are true to the best of my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters I believe them to be true.

                                                Bradley Reifler

Sworn to before me this
16 day of June, 2017

_____
Notary Public

```
MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires
```